JONATHAN CLAYTON, *against* JOHN CLAYTON,

IN ERROR.

*Philadelphia,*
*Monday,*
July 22.

The testator devised " unto *S. E.* the granddaughter of his sister, and to her children, the *plantation* they then lived upon, for the use of her the said *S. E.* during her life, and immediately after her decease, to be equally divided among the surviving children of her the said *S. E.*" He gave a legacy of 10*l.* to his heir at law, and 40*l.* to each of the children of his heir. *Held* that the children of *S. E.* took but an estate for life.

IN ejectment in the Common Pleas of *Bucks*, by *John Clayton* the plaintiff below, judgment was entered in his favour upon the following case, which by agreement was brought up by writ of error.

*Richard Clayton* deceased, being seised in fee of a tract of land containing five hundred acres in the township of *Southampton* in the county of *Bucks*, of which the lands in the declaration are part, on the 15th of *November* 1770 made his last will and testament bearing date the same day and year, and afterwards on the 16th of the same month and year, duly made a codicil thereto, by which will he devised as follows: " I give unto my nephew *Richard Clayton*, the " son of my brother *John Clayton*, ten pounds lawful money " aforesaid. I give unto the children of the said *Richard*

" *Clayton* by his wife, each and every one of them, 40*l*. law-
" ful money aforesaid, to be put out to interest by my execu-
" tors for their use until they respectively arrive to the age
" of twenty-one years. *I give and bequeath unto Sarah Evans,*
" *wife of James Evans, and granddaughter of my sister*
" *Margaret Jones, and to her children, the plantation they*
" *now live upon, being the same tract of land I bought of Ja-*
" *cob Jones, containing one hundred and seventy-one acres,*
" *for the use of her the said Sarah Evans during her life, and*
" *immediately after her decease to be equally divided among*
" *the surviving children of her the said Sarah Evans.*"

The codicil contained the following clause. " As for and
" concerning the plantation I have bequeathed unto *Sarah*
" *Evans*, wife of *James Evans*, for the benefit of her the said
" *Sarah Evans* and her children, my will is that the timber
" thereof shall be preserved, and not destroyed by any per-
" son or persons whatsoever, firewood and fencing, being for
" the use of the said plantation, excepted."

The testator died seised in the same month, without can-
celling or altering the said will or codicil.

*Sarah Evans* in the said will named, had at the time of the
making thereof, lawful issue five children living, to wit, *Rich-
ard, Enoch, James, Sarah,* and *Elizabeth* who afterwards
intermarried with *Jonathan Clayton* jun. *the defendant.* Af-
ter the death of the testator, the said *Sarah Evans* entered
and was possessed, and after residing thereon for some years,
died in possession during the lifetime of her said five chil-
dren, who immediately after her death entered and were pos-
sessed. Shortly after, to wit in *June* 1789, *Sarah* the daugh-
ter of the said *Sarah Evans* died intestate and without issue,
and on the 3d of *August* 1793, the four surviving children, to
wit *Richard, Enoch, James,* and *Elizabeth* with her husband
*Jonathan Clayton* jun., by deeds mutually executed, made
partition among themselves of the said plantation, by which,
a tract of twenty-nine acres thirteen perches, was released
and confirmed to *Jonathan Clayton* jun. and *Elizabeth* his
wife, and the heirs of *Elizabeth*, as her purpart. The lands
in the declaration are part of this tract. *Jonathan Clayton*
and *Elizabeth* his wife entered and were possessed, and in
the month of *May* 1809 *Elizabeth* died leaving lawful issue.

1811.

CLAYTON
v.
CLAYTON.

*Richard Clayton* the testator died without issue; but in his lifetime he had an only brother *John Clayton*, who died before him, leaving lawful issue *Richard* his son and heir at law, who survived the testator, and was also his heir at law and a legatee in the said will of *ten* pounds. The said *Richard* the second, afterwards in the year 1772, died, leaving lawful issue *John Clayton* his eldest son, *the plaintiff*, *Jane*, *Elizabeth*, *Hannah*, *Rachel*, and *Dorothy*, daughters. On the 18th of *August* 1809, and prior to the commencement of this suit, the plaintiff made an actual entry in the lands in the declaration mentioned, claiming them as heir at law to his great uncle *Richard* the testator; and cut off a small ash tree, and left notice of the entry &c. with the defendant.

The defendant is in possession of the lands in the declaration mentioned.

The question for the opinion of the court, is whether the children of *Sarah Evans* took an estate in fee simple, or only an estate for life. If for life, then judgment to be entered for the plaintiff; if in fee simple, then for the defendant.

*Dick* for the plaintiff in error, argued in favour of a fee simple, which he said the testator intended to give to the children of *Sarah Evans*, as was obvious from many circumstances in the will. The governing rule in the interpretation of wills is the intention of the testator. He is regarded by the law as *inops consilii;* as wholly unacquainted with technical language; as not at all versed in the artificial limitations of estates; and therefore with infinite propriety it exempts him from the necessity of doing more than plainly expressing his meaning, which if not contrary to the rules of law, it will uniformly execute. Nay, for the purpose of ascertaining this meaning, even where it is not plain upon first view, courts will sift the entire will, and will understand its language, not as lawyers, but as ordinary men. *Wood's Inst.* 299., *Shep. Touch.* 434., 2 *Black. Comm.* 381. note 12., *Holmes* v. *Maynill* (a), *Strong* v. *Cummin* (b), *Brownsword* v. *Edwards* (c), *Frogmorton* v. *Holyday* (d), *Bridgwater* v. *Bol-*

(a) 2 *Show.* 137.          (c) 2 *Ves.* 247.
(b) 2 *Burr.* 770.          (d) 3 *Burr.* 1622.

ton (*a*), Grayson v. Atkinson (*b*), Bowes v. Blackett (*c*) Cowper v. Cowper (*d*), Ginger v. White (*e*), Kennon v. M'Roberts (*f*), Shermer v. Shermer's executors (*g*), Minnis v. Aylett (*h*), Roy v. Garnett (*i*), Lambert v. Paine (*k*). It is the remark of judge *Johnson*, in the last cited case, that the fair presumption generally is, that he who enters upon making a will, intends to make a full distribution of every thing he possesses; and in the present case, where there is no residuary clause, and where the testator has throughout spoken the common language, another presumption is equally fair, that he intended to make a distribution of every thing among the persons he named, and did not expect that any latent interest was to spring up at a distant day for the benefit of any one whom he did not name. At the date of the will, *Richard Clayton* was his heir at law, to whom he gave 10*l.*, and to his children 40*l.* each. Is it not perfectly clear to every mind that he did not intend to give them more? It is true that lord *Mansfield* in Hogan v. Jackson, (*l*) says this circumstance *alone* will not exclude the heir; but he admits it to have great weight in that case, and coupled with others in this, it ought to be conclusive. Among other circumstances with which it may be connected, is the limitation to *Sarah Evans* for *life*, which is not carried over to the devise to the children. If it is to be generally presumed that a testator intends to give the whole, how much more, when he has first created a life estate out of a plantation to the parent, and upon her death gives it to her children. Ordinary men do not think of creating successive life estates out of the same fee. Another circumstance is the division which he directs to be immediately made among the *surviving* children after the death of their mother. The survivorship, and the division, are both striking features. It is very like Rose v. Hill. (*m*) The case however which is most directly in point is Wigfall v. Brydon. (*n*) It was a devise of real estate to *A* for life, and after his death to *B* for life, and after the death of *B* to the children

(*a*) 2 *Salk.* 237.
(*b*) 1 *Wils.* 334.
(*c*) *Cowp.* 238.
(*d*) 2 *P. Wms.* 741.
(*e*) *Willes* 350.

(*f*) 1 *Wash.* 99.
(*g*) 1 *Wash.* 271.
(*h*) 1 *Wash.* 302.
(*i*) 2 *Wash.* 31.

(*k*) 3 *Cranch* 129.
(*l*) *Cowp.* 307.
(*m*) 3 *Burr.* 1881.
(*n*) 3 *Burr.* 1895.

of the testatrix's cousins *C* and *D*, or such of them as should then be living, share and share alike; and if it should happen that *B* should not be living at the death of *A*, then that the property should *be divided amongst the said children* as aforesaid. Lord *Mansfield* said that the estate was given to *A* expressly for life, and so to *B*. If the testatrix had *meant* the like to the children, she would have *done* the like. Besides, she directed the property to be *divided* amongst seven children, that is, she intended the value to be divided among them, and therefore meant a fee. It is not necessary that there should be either words of limitation annexed to the devise, or even words indicating the quantity of estate, to convey a fee. In *Moone* v. *Heaseman* (*a*) there was neither. The testator gave all his lands in *Cowfold* to his sister for life, and after her decease to her daughter *S.* paying to each of her sisters *E.* and *M.* 500*l.* a piece; and if either of them should die, the survivor was to take the legacy, and if *S.* should die, the testator willed *that the farm should be divided* between the survivors. The court held that *E.* and *M.* were to take a fee in the event mentioned, and *Willes* Chief Justice evidently questioned *Pettywood* v. *Cooke* (*b*) where the contrary had been ruled. *Goodright* v. *Allin* (*c*) confirms *Moone* v. *Heaseman.* The case of *French* v. *M'Ilhenny* (*d*) seems indeed to conclude this case. The peculiar features of that will exist in this, and in this is one which did not exist there, the legacy to the heir at law. Nothing but a technical construction can raise a difficulty; and it is this halting between a strict artificial interpretation of wills, and a liberal understanding of their terms as unlearned men would use and understand them, that the confusion in the construction of wills has arisen. The only way to avoid it, is to adopt and execute the intention, without regard to technical language.

*Condy* and *T. Ross* for the defendant in error. We admit that the intention must govern, but it must be a plain intention; not such as the private conjectures of a judge may

(*a*) *Willes* 138.          (*c*) 2 *W. Black.* 1042.
(*b*) *Cro. Eliz.* 52.          (*d*) 2 *Binn.* 13.

raise, but such as no enlightened mind can escape from. Whatever the law lays down as a rule of real property, is a just rule; the party holds and gives it according to that rule; and as well may any one part of an artificial system be censured as another, since the whole depends upon policy and convenience, and not upon any principle of justice or morality. Before the statute of wills, lands were not devisable at all, except perhaps in the Saxon times, or by particular custom. They became so generally by positive law. Judicial decisions have established certain rules for the construction of such devises. They may be arbitrary rules, but they are not more so than other parts of the system. They are simple and certain, and it is of importance that when once settled they should never be shaken. Estates are transferred under their authority; family settlements are bottomed upon them; and however in particular cases a violation of these rules may gratify the feelings of an individual, yet it lets in such a flood of uncertainty, that no one can tell what is the construction of a will without resorting to a court, and even different courts may as well disagree, as different individuals. There is no safety but in an adherence to judicial precedent, until the legislature, not the court, shall think fit to destroy its authority. Two of these rules have been acquiesced in for a century and a half. The one is, that where real property is devised without limitation, it is but an estate for life, unless from other parts of the will, an intention to give a greater estate is plainly to be inferred. The other is, that the heir at law is not to be disinherited without express words, or necessary implication. Conjecture, ambiguity, uncertainty, shall never disinherit him. *Hayford* v. *Benlows* (a), *Harwood* v. *Goodright* (b), *Frogmorton* v. *Wright* (c), *Bowes* v. *Blackett* (d). In the present case the devise to the children of *Sarah Evans* is without limitation; and every argument in support of a fee, is not only conjecture, but it is conjecture in direct opposition to judicial precedent. The direction that the estate should be divided among the children is no-

(a) *Ambl.* 583.                (c) 3 *Wils.* 418.
(b) *Cowp.* 92.                 (d) *Cowp.* 235.

thing. In *Dickins* v. *Marshal* (a) the devise was of all the testator's lands and goods to *R.* and *M.* his children, *equally to be divided* between them; and it was held to be an estate for life. In *Peiton* v. *Banks* (b) the testator devised lands to his wife for life, and the reversion to *A* and *B* to be equally divided betwixt them; and yet *A* and *B* took but for life. Here was both the express estate for life, and the division, but without any influence. In *Woodward* v. *Glassbrook* (c), one devised several parcels of land to his several children in tail, and if any of them should die before twenty-one or unmarried, his part to go to the survivors; yet the survivors took only a life estate in that part. *Middleton* v. *Swain* (d) is a strong case to the point, that although you may see enough on the will to make you think it probable that a fee was intended, yet *probability* will not do; it must be a plain case. As to the pecuniary legacy to the heir at law, the point occurred in *Roe* v. *Bolton* (e) where it was not allowed the least weight. The authority of *Pettiwood* v. *Cook* has never been judicially shaken; it is supported by many later cases. The only decision which countenances the argument for a fee is *Wigfall* v. *Brydon.* But this case cannot be law; and if it be, it has been so explained as to be a very different case from the present. In *Burrow's* report of the case, lord *Mansfield* puts the decision upon the estate's being small, a wasting estate, and not fit for division, which are not very good reasons. However be they good or bad, they do not apply here, where the estate is large and has been divided. In *Wigfall* v. *Brydon* it was a house and barn. The true ground of that case was that the devise amounted to a power to *sell* and divide. So it appears from *Goodright* v. *Patch.* [Here the counsel read a manuscript note of that case taken by Mr. *Edward Tilghman* in the King's Bench in *June* 1773.] *French* v. *M'Ilhenny* was a very different case. The will contained introductory words shewing an intention to dispose of every thing, and the devise in question was of all the plantation not before given to the wife, which was a life estate. The codicil to the present will negatives a fee, as it prohibits the devisees from

(a) *Cro. Eliz.* 330.     (c) 2 *Vern.* 388.     (e) 2 *W. Black.* 1045.
(b) 1 *Vern.* 65.     (d) *Skinner* 339.

cutting timber, which the testator would not have done, had
he intended an absolute estate of inheritance.

TILGHMAN C. J. *Richard Clayton* deceased, by his last
will and testament dated 15th *November* 1770 devised as fol-
lows. " I give and bequeath unto *Sarah Evans* wife of *James*
" *Evans*, and granddaughter of my sister *Margaret Jones*,
" and to her children, the plantation they now live upon, be-
" ing the same tract of land I bought of *Jacob Jones*, con-
" taining one hundred and seventy-one acres, for the use of
" her the said *Sarah Evans* during her life, and immediately
" after her decease to be equally divided among the survi-
" ving children of her the said *Sarah Evans*." A legacy of
10*l.* was given to the testator's nephew *Richard Clayton*, who
was his *heir*, and 40*l.* a piece to each of his children. In a
codicil dated the day after the will, there is the following
clause. " And as for and concerning the plantation I have
" bequeathed to *Sarah Evans* wife of *James Evans*, for the
" benefit of her the said *Sarah Evans* and her children, my
" will is that the timber thereof shall be preserved, and not
" destroyed by any person or persons whatever, firewood and
" fencing, being for the use of the said plantation, excepted."
Did the children of *Sarah Evans* take an estate for life or in
fee simple? That is the point for our decision.

That the intention of the testator shall be carried into effect,
if not contrary to law, even though such intention shall not be
expressed in the usual form, is a principle not to be contro-
verted; but such intention must appear by the *words of the
will*, and not by *conjecture*. It is also a settled principle, that a
devise of land to a person in general terms, without words of
limitation, or any other words shewing an intent to give more
than an estate for life, shall pass no more than an estate for life,
unless it can be fairly inferred from other parts of the will,
that more than an estate for life is intended. For instance, if
the devisee is ordered to pay a sum of money to another per-
son, it may be fairly inferred that a fee simple was intended,
because otherwise the devise might turn out to be an injury
rather than a benefit. It has been often said, that it may be
reasonably supposed the testator intends a fee simple in every
case, in which there are no expressions to the contrary; that

when a man gives a thing, he means to give the whole property. But although this has been said, it has always been added, that whatever *conjecture* the judge might form as to the intention, yet he is bound by the principle which in such cases has confined the estate to the life of the devisee. When a principle of construction has been fixed, it becomes a rule of property, and cannot be unfixed without violating the rights of property. Purchases are made under the advice of counsel, and the opinions of counsel are formed on the decisions of the courts. When the legislature think proper to make alterations in the law, they take care to confine them to *future cases;* but fluctuating decisions of courts of justice, have a mischievous *ex post facto* operation. These considerations have satisfied me, that I am not at liberty to indulge myself in *conjecture,* concerning the intention of the testator. The estate is not to be taken from the heir, without an express devise, or words from which a clear implication may be drawn. Let us apply these principles to the will in question. An express estate for life is given to *Sarah Evans,* and immediately after her death the estate is to be *equally divided* among her children. Here is a devise in general terms to the children. What ground is there for implying a larger estate? It may be said, that inasmuch as their estate is not to commence till after their mother's death, it may be supposed that they were to take the fee, because otherwise they might derive but little benefit. This remark would have little weight, if it was now made for the *first* time. But after the numerous decisions, in which devises to commence in possession after the expiration of a life, have been held to convey no more than a life estate, it has no weight at all. Another circumstance relied on by the counsel for the plaintiff in error, is, that the estate is to be *divided* among the children. If the estate had been ordered to be *sold,* and the *money* divided, the absolute property would have passed to the devisees. But it is the *land* which is to be divided. The convenience with which the land may be divided, depends upon the quantity of the land, and the nature and value of the improvements, but by no means upon the quantity of estate given to the devisees. In support of the argument drawn from the estate's being ordered to be *divided, Oates ex dem.*

*Wigfall* v. *Brydon* was cited, 3 *Burr.* 1895. Lord *Mansfield* in giving the opinion of the court in that case, says, " The " testator gives to the seven children after the two lives, a " *wasting* property, share and share alike. Besides, she di- " rects the house and stable to be divided amongst the seven " children, that is, they must be *sold and the produce divided.*" If the will in that case directed the estate to be sold and the produce divided, no doubt the whole interest passed; or if the estate was of such a nature, that it could not be divided into seven parts, there would be some reason for saying that the testator knew it must be sold, and must have so intend- ed. But if that was not the case, it will be difficult to recon- cile this opinion of lord *Mansfield* with other decisions of good authority. In *Peiton* v. *Banks*, 1 *Vern.* 65., there was a devise to the wife for life, with remainder to *A* and *B* to be equally divided. It was held that *A* and *B* took but an estate for life. In the manuscript note of the case of *Goodright* v. *Patch*, decided in the King's Bench 20th *June* 1773, and shewn to the court by Mr. *Edward Tilghman*, it is said that the case of *Wigfall* v. *Brydon* turned on the *selling and divi- ding*. And in *Denn ex dem. Gaskin* v. *Gaskin*, lord *Mansfield* speaking of *Wigfall* v. *Brydon* says, " the ground the court " went upon, was, that from the nature of the estate, and the " words used by the testator, they amounted in fact to a " direction to sell the estate, and divide the produce of it." *Cowp.* 659. Whether the court were warranted in putting that construction on the will, it is unnecessary now to inquire, be- cause in the case before us, there is no ground for an argument of this kind. There is no difficulty about dividing, for the land has been actually divided; nor is there the most distant inti- mation of a desire, that the estate should be sold. *French* v. *M'Ilhenny*, 2 *Binn.* 13., decided in this court, was also cited. In that case the court were divided. A majority were of opinion, that taking the whole will together, they could dis- cover an intent to give an estate in fee; but I did not under- stand that any change was intended to be made in the esta- blished principles of construction. Suffice it to say, that the expressions on which the court relied *there*, are not to be found in the will of *Richard Clayton.*

The last and strongest argument in favour of a fee simple, is

drawn from the devise of 10*l.* to the heir at law. This circum-stance is worthy of consideration. It affords some ground for supposing, that as 10*l.* was given, it was intended that the heir should have *no more.* But a doubtful intention is not sufficient. The rule of law gives the estate to the heir, unless the will takes it from him; and in order to take it from him, it must give it to some other person. Thus we are brought back to the question, are there any words in this will, sufficient to convey more than an estate for life to the devisees? I can find none. If the testator had expressly said, that the heir at law should have 10*l.* and *no more,* I should have thought his intention on the whole sufficiently clear, to give a fee to the children of *Sarah Evans.* But the implication arising from a small devise to the heir, without negative words added, has been expressly decided to be insufficient. In *Wright on the demise of Shaw* v. *Russel,* decided in the exchequer in 1701, and cited by justice *Wright* in *Gaskin* v. *Gaskin, Cowper* 661., there was a devise of 1*s.* to the *husband* of the heir, and yet the heir was held not to be disinherited. And in subsequent cases, the same principle has been adopted, when there were devises of a small sum to the *heir himself.* In such cases there is plausi-ble ground for *conjecture,* that it was intended to *disinherit* the heir, because we know, it is a common notion, that it is necessary to give a shilling to the heir in order to *cut him off.* This notion is derived from the Roman law, by which a tes-tament was said to be *inofficious,* if no mention was made of the heir. The decisions in these cases, all tend strongly to confirm the principle, that the heir takes every thing which is not given away by express words or clear implication. The will of *Richard Clayton* containing no such words, nor any ground for clear implication, I am of opinion that the chil-dren of *Sarah Evans* took no more than an estate for life.

The codicil is to be considered in conjunction with the will. I do not think the *direction* about the timber very ma-terial; but if it has any operation, it is against a fee simple, because a direction that a devisee in fee should not cut tim-ber, would be inconsistent with the nature of the estate, and therefore void. My reason for not thinking it very material, is, that it is not clearly expressed to whom this direction is addressed, whether to *Sarah Evans* or her children.

YEATES J. The question before the court rests on the true construction of the last will of *Richard Clayton* deceased, dated 15th *November* 1770, and the codicil thereto dated the day following. The material clauses are as follow. " I give " and bequeath unto *Sarah Evans*, wife of *James Evans*, and " granddaughter of my sister *Margaret Jones*, and to her " children, the plantation they now live upon, being the same " tract of land I bought of *Jacob Jones*, containing one hun- " dred and seventy-one acres, for the use of her the said *Sa-* " *rah Evans during her life*, and immediately after her de- " cease *to be equally divided among the surviving children* of " the said *Sarah Evans*." In the codicil it is said, " And as " for and concerning the plantation I have bequeathed unto " *Sarah Evans*, wife of *James Evans*, for the benefit of her " the said *Sarah Evans* and her children, my will is, that the " timber thereof shall be preserved, and not destroyed by " any person or persons whatsoever, firewood and fencing, " being for the use of the said plantation, excepted." There are no introductory words shewing the intention of the tes- tator to dispose of his *estate*, either by the will or codicil; nor are there any residuary devisees appointed by either instru- ment. The privileges out of the real estate devised to the widow, are confined to her state of widowhood. *Sarah Evans* the devisee died in the possession of the premises, leaving five children, one of whom has died intestate. The four sur- viving children have made partition, and twenty-nine acres and thirteen perches have been assigned to *Elizabeth*, who intermarried with the plaintiff in error, as her full purpart and share of the lands devised as aforesaid. She is also dead, and the suit is brought to recover the possession of the twen- ty-nine acres and thirteen perches, by *John Clayton*, who has proved himself to be the heir at law of the testator. The question to be decided, is, whether the children of *Sarah Evans* named in the will, took an estate in fee simple in the said plantation, or only an estate for life.

On the part of the plaintiff in error, it has been strongly contended, that the intention of a testator as disclosed in his will, according to the plain meaning of his words in their common sense and understanding, is the paramount rule of construction; and that where the devise is conformable to

1811.

CLAYTON
v.
CLAYTON.

law, no technical expressions whatever are necessary to effectuate his intent. All artificial rules are disclaimed; and it is confidently asserted, that the compound construction of the *common acceptation of terms and the technical meaning*, has been the cause of uncertainty in the exposition of testaments. When a testator makes his will, it must be presumed that he means to dispose of all his temporal property; and this is strengthened by the circumstance of his not devising the residue. Introductory words in a will are the mere creatures of the scrivener, who draws it; and nothing can be inferred from the want of them. No man of plain common sense on reading this will could hesitate in pronouncing, that when the testator gave the plantation to *Sarah Evans* during her life, and after her death to be legally divided amongst her surviving children, his meaning was, that those children should take after their mother's death, their several proportions thereof, absolutely and in fee simple; and this construction is fortified by a devise of 10*l.* to *Richard Clayton* his nephew and heir at law at the time of his death, and to each of his children 40*l.*

The defendant's counsel fully admit, that the intention of the testator is the governing principle in the construction of wills; and that there is no magic in any particular form of words, whereby his meaning may be effectuated; though it is indispensably necessary that his intention should be clear and manifest, from the expressions he has made use of. Independently of human laws, there is no natural right of succession to lands. The statutes of 32 *Henry* 8. *c.* 1. and of 34 and 35 *Henry* 8. *c.* 5. in *England*, gave the general power of aliening lands by will. It is agreed, that great indulgence is given in the construction of wills, the law considering the party *in extremis et inops consilii.* Though no words of limitation are added to a devise of lands, yet if there are expressions of equal import, as the words *forever, my estate, paying such a sum of money, &c.* the law will enlarge the gift accordingly. But the settled rule is, that the heir at law is the favourite of the law and of equity; and is not to be disinherited without express words or necessary implication. *Ambl.* 583. If the intention of the testator be doubtful, whether the devisee shall take in fee or not, the rule shall take

place. *Cowp.* 92. 355., 3 *Wils.* 418. Without words of inheritance, an estate for life only passes. *Cro. El.* 330.

By discarding settled rules of construction, and adjudged cases on wills, a judicial tyranny will be established, and this branch of the law be thrown into confusion and uncertainty. No counsel can advise his client; under a controverted will no man can purchase with safety.

Many cases occur in the books, where there is a devise to one for life, the reversion over to others equally to .be divided between them, and the latter have been held to take an estate for life only. *Peiton* v. *Banks,* 1 *Vern.* 65., *Bowes* v. *Blackett, Cowp.* 235. The words " *share and share alike*" are held to be tantamount to " *equally divided between them*"; and the word " *share*" was held to express the thing devised, and not the quantity of the estate. *Middleton* v. *Swain, Skin.* 339., which was affirmed in parliament. *Show. Parl. Ca.* 207. One devised several parcels of land to his several children in tail, and if any of them should die before twenty-one or unmarried, such child's part to go to the surviving children; adjudged, that the survivors should have such share for life only. *Woodward* v. *Glassbrook,* 2 *Vern.* 388. Devise of all my lands and goods after debts and legacies paid, to *A* and *B* my children equally to be divided between them; held that an estate for life only passed to them in joint-tenancy. *Dickens* v. *Marshal, Cro. El.* 330. As to the legacy of 10*l.* devised by the present will to the heir at law, the court of Common Pleas were clearly of opinion that a small pecuniary legacy to the heir is not sufficient to exempt a case from the general rule of law, which declares that a gift to a man of lands, without expressing for what estate, vests only an estate for life. *Roe ex dem. Callow et al.* v. *Bolton,* 2 *Black. Rep.* 1045.

The remark, that general introductory words, evincing a disposition to dispose of all the temporal estate, are the mere acts of the scrivener, either proves too much or nothing whatever. Assuredly the will is drawn by him; but if he does not with correctness reduce to writing the intent of the deceased, or uses unapt and improper words, whose legal operation is opposed to the will of the testator, what human tribunal governed by known and fixed rules of decision, can apply the remedy?

When it is asserted, that the plain meaning of the will was to give an estate in fee simple to the children of *Sarah Evans* in the lands in question, it is presupposed that the rules of granting realty and personalty are precisely the same, and that lands would pass with as little ceremony as a horse or a cow. This certainly would prostrate all judicial decisions. At best however it is but guess and conjecture. Whoever drew the will, had some faint idea of words of limitation. When devising the negroes to the widow, he superadded the words " *and to her heirs and assigns;*" and in devising certain lands to *Jonathan Clayton*, he annexes the payment of a gross sum, which would clearly give a fee, the same being inconsistent with a life estate in the premises. To this may be subjoined the observation, that the restrictions imposed in the codicil, as to the preservation of the timber on the plantation devised to *Sarah Evans* and her children, are totally incompatible with the latter taking a fee simple interest therein. Admitting however the meaning of the testator herein to be problematical, the rule of law is decisive against the pretensions of the plaintiff in error.

I feel no difficulty whatever in the decision of the present case, either on principle or precedent. An act of the legislature (passed on the 28th *January* 1777) has declared, that the common law and such of the statute laws of *England,* as had theretofore been in force, except as is thereafter excepted, shall be in force and binding on the inhabitants of this state. The rule relied on by the plaintiff is frequently asserted, in the *English* books, which are evidence of the common law. This court, and I think I may safely add, every other court of justice in the government both before and since the American revolution, have adopted it. In *Busby* v. *Busby,* 1 *Dall.* 226., we find these expressions of *Shippen* president of the Common Pleas. " The intention of the testator is said " to be the pole star, to guide the construction of wills. But " there are two qualifications to this rule. 1st, That this in- " tention must not clash with the rules of law, and 2d, that " where legal technical terms are wanting, the intention to " supply them must be clear and manifest from the words " and expressions in the will." I cannot see on what grounds the judiciary would be authorized to change the strong uni-

form current of decision, unless by the aid of the legislative branch.

But independently of the act of 1777, could we either with propriety or convenience to the public peace and safety, change the system of law on this subject? As to myself, I find the decisions of our own courts an insuperable obstacle in my way; and I frankly declare, that I am not prepared to go the whole length of declaring independence of the decisions of the English courts, previous to the 4th *July* 1776, subjecting the construction of a will to technical rules. My habits, grown rigid during the period of half a century of my life, imperiously interdict the measure. I have been taught to consider those judicial determinations as a system of refined wisdom matured by experience, which it would be highly dangerous now to unsettle. I view them as establishing the landmarks of property, which it would be unjust now to vary or remove. In a particular instance my individual wishes may lead me to desire, that the devise was couched in different terms, in order to accomplish my ideas of the supposed intent of the testator. I will construe a will, and imply an intention not expressed therein in words particularly; but I will not from arbitrary conjecture, though founded on the highest degree of probability, add to a will or supply the omissions. I go as far as I can, when I repeat the language of an English judge. " I will depart from the techni-
" cal sense of words, to effectuate the intention of a testator,
" as far as possible without violating the rules of law." In matters of positive right, I must submit to and follow those ancient and invariable maxims, *quæ relicta sunt et tradita.* 3 *Bl. Com.* 436. It is of not so much moment what the law is, as that it should be known and settled. When this takes place, every citizen is bound to conform to it; and when a case of seeming hardship occurs, wherein I may think the will of a testator has been disappointed, I console myself with the reflection, *sic voluit sed non dixit.* It is most congenial to the spirit of a government of laws, that known rules should determine the conduct of their tribunals of justice, and the steps of their judges be measured. The observation applies with peculiar force to the case of wills, wherein different and contradictory intents often appear on the face of

the same instrument, wherein the meaning is not conveyed with any degree of precision, and the different events which might take place have not been contemplated. In such instances, with all the assistance we can derive from our books, we are thrown under the greatest embarrassments; but without it, shall we not according to the ludicrous idea of Mr. *Selden* (untruly applied to a court of equity,) make the measure of the judge's foot, the rule of decision? In my view of the case, the utmost uncertainty and confusion must necessarily be introduced by this rage of innovation.

The established rule is thus laid down by lord *Mansfield* in *Loveanes on the demise of Mudge* v. *Blight et ux.*, Cowp. 355. " Where there are no words of limitation, the court " must determine in the case of a devise affecting real estate, " that the devisee has only an estate for life; because the " principle is fully settled and established, and no conjecture " of a private imagination can shake a rule of law. If the " intention of the testator is *doubtful*, the rule of law must " take place; and so if the court cannot find words in the " will sufficient to carry a fee. Though they should them- " selves be satisfied beyond the possibility of a doubt, as to " what the intention of the party was, they must adhere to " the rule of law."

The observations of the defendant's counsel abundantly satisfy my mind, that the intention of the testator to grant a fee simple to the children of *Sarah Evans* in the lands in question, was at least doubtful; and the authorities they have cited fully confirm this remark. See also *Moone lessee of Fagge* v. *Heaseman. Willes* 141.

I am therefore of opinion that judgment should be entered for the defendant in error.

BRACKENRIDGE J. The language of this will is not that of a *learned* or *half learned* person, but evidently of the testator's own writing, without a single word through the whole that savours of an affectation of *scientific terms;* for I consider the words " heirs and assigns" annexed to the gift of the " *negro boy*" devised to the wife, as slipping in of course, from having used it, or seen it used in a bond or promissory note, where being unnecessary, we have it with-

out any meaning, now that a note is assignable by act of assembly, and the interest in the nature of it goes to the executor, and not to the heir in the technical sense of the word. It would have saved this trouble, if these words had been annexed to the devise of *the real estate;* and perhaps it would be no great strength of construction, if we were to carry them forward in our minds, and make use of them when *first wanted.* This is thought to be, when we come to the devise of the " *plantation to the wife of James Evans,* " *and grand daughter of his sister Margaret Jones, and to* " *her children.*" But as this might be considered a stretch beyond the indulgence shewn to wills, I shall not insist upon it; though at the same time, if the testator thought of the use of these terms " heirs and assigns" at all, I have no manner of doubt, but that he thought that having put them in the writing *once* at the beginning, they would serve *to season it through the whole,* and qualify every bequest that was subsequently made. But I flatter myself we shall be able to do without them, and be justifiable in inferring *a devise in fee simple* from the terms that are used. I shall take notice nevertheless of the other devises, " *to his nephew Richard* " *Clayton* the son of his brother *John Clayton* 10*l.*; to the " children of the said *Richard Clayton,* each and every one " of them, forty pounds; to his nephew *Jonathan Clayton,* the " son of his brother *John, his mansion house, with the land* " *thereunto belonging.*" Here are no words of inheritance, more than in the case of other devises of personal property; and yet I cannot doubt but that he meant his nephew should have the *mansion house and land,* out and out. It has not been questioned under this will but that he does so hold it. The plaintiff is the *descendant of the nephew Richard,* to whom the devise of ten pounds was made; and to whose children, a farther devise of forty pounds each, which may fairly be considered as all that was intended that stock; yet *it is one of these* that now claims the estate in question against another devisee.

But to come to the terms that are used in the devise under which the defendant claims. These are found in the will, and in the codicil. But before we undertake to consider these, let there be premised an observation on *the*

*history of the construction of wills.* The power to devise being. *given by statute,* it came to the courts to construe wills *as other writings;* and why introduce a distinction in the construction of these, and other writings? What distinction? Why that *the intention* shall govern, but that the same words which would *be evidence of intention* in the case of a chattel, shall not evince in a case of real estate. Yet they did not require the technical terms of a deed, but indulged the lay people, who might be supposed to write their own wills, to a certain extent. And why not to the whole extent of the popular language? *Licentia sumpta pudenter,* it may be said; and that it would be too great a stretch at once to go so far. It would have been equally justifiable however, and certainly more for the quiet of possessions. The rule ought to have been, *that unless something appears in the will from which a less estate than a fee simple is given, the devise shall carry a fee.* The rule is otherwise; viz. that something must appear, more than the mere giving the property, from whence it may be inferred that a fee simple was intended. The mere naked words, *I give the land,* as in the case of a personal chattel, will not suffice. It is true the decisions have brought this to a very slight matter. Introductory words declaring an intention to dispose of the *whole worldly estate, to settle temporal affairs,* &c. *Estate* and even *effects* have been considered *ex vi termini* as carrying a fee. The word *settle,* certainly has. That I may not be thought to speak without book, I cite the case. *Barnard. Chancery Rep.* 14. 8 *Viner* 230. I meant to have said, cite the books which refer to the case. " What " I have, I intend to *settle* in this manner." By the word *settle* says the lord chancellor, the testator shews his intention to make a *settlement* of the whole estate, and therefore a fee. He farther observes, that " all cases depend upon their par- " ticular circumstances, and the evidence of the testator's in- " tention arising from these." This last sentence is the best dictum that I have met with in the books; for the taking the relative situation of the testator and the devisees into view, the branches of the family referred to in the will, and the provisions made, in connexion with the words of the devise, these may assist in demonstrating the intention. But in this case, from the words of the will in the devise

itself, independent of circumstances, I can have no doubt
that a fee simple was intended. " *The plantation for the*
" *use of the sister's granddaughter during her natural life,*
" *and immediately after her decease, to be equally divided*
" *amongst her surviving children.*" It could not come to the
children until after her decease, because until that time it
could not appear what children would be surviving. It was
not therefore a devise to her and her children jointly, for
they *did not take at the same time.* It was a life estate cut out
of the fee, to the mother in the first instance; then *the plan-*
*tation* to the children. Even did the case rest here, I should
have no doubt the testator meant the fee simple after the life
estate. But the plantation to *be equally divided.* Can it be pos-
sible that he meant a life estate after the subdivision? That
a hundred and seventy-one acres should be divided between
five, a dwelling house it may be presumed built by each up-
on his lot of fifty acres, a garden, an orchard, a grass plot or
meadow, and that an individual from the *rookery of heirs*
should come in at a distant day and possess these improve-
ments? *The subdivision* is conclusive with me that he intend-
ed an inheritance.

But it is alleged that the codicil qualifies, and shews that
a fee was not intended, viz. " As for and concerning the
" plantation, my will is, that the timber thereof shall be pre-
" served, and not destroyed by any person or persons what-
" soever, firewood and fencing excepted." What can this
relate to, but to the life estate to the mother, with which
estate such a restraint is perfectly consistent? So far from
evincing a qualification of the interest in the tract that was
afterwards to be divided, it proves to me the solicitude of
the testator to preserve it with wood land as it was, in order
that it might be subdivided with convenience of timber to
the children, when, on the death of the mother, *they came*
*severally to enjoy it.* At all events it is nothing more, fairly
construed according to what we know of the care of an un-
cle, than a caution or direction in *the use,* and not a qualifi-
cation of *the interest* in the estate. It would be an unnatural
appropriation of the terms to give them that effect.

Now for authority, as it is called; though I will acknow-
ledge, I set little store by the early decisions, when it was a

struggle with the courts, whether and to what extent they would indulge in wills. Yet I will cite one case referred to in the books, and which looks a little like the case here. " All " the rest of my estate I devise, one third to my wife, and " the rest to my children *equally to be divided between them.*" *Carter* v. *Horner,* 4 *Mod.* 89. In *Skinner* 195., the same case is cited by the reporter, and affirmed to be adjudged " *that* " *all past in fee,* and it was enjoyed accordingly." *A* having three sons, devised to them his *lands equally to be divided.* They have a fee simple; for if the younger had not a fee, he would not have an equal share to the other. 8 *Viner* 237.

I had taken it that the decision in *French* v. *M'Ilhenny,* though without the Chief Justice, yet by force of number, if not by weight of judgment, had become a precedent in our decisions. But in the case of *French* v. *M'Ilhenny* there was more difficulty in making out a fee than in this. Here I take it there is plain sailing. The words " for life" used in the devise to the mother, *omitted in the devise to the children,* is as much as to say, to them *not for life, but altogether.* This is the reasoning of Justice *Wilmot,* who delivered the opinion of the court in the absence of lord *Mansfield,* as reported in 3 *Burrow* 1539. " Devise to *Clement Boreham* " *for and during the term of his natural life,* followed by a " devise to *Sarah Boreham* of another tenement. But in the " devise to *Sarah,* he *omits* the words, *for and during natural* " *life;* which words it must be supposed he would have " *inserted* in case he had intended to give her only an estate " for life, because he had just before done so in the prece- " ding devise to *Clement.* It is plain that by giving it to her " generally, without having any such restrictive words as he " had before added to his devise to *Clement,* that he meant " to give her the absolute property. He meant to devise it " *ut bona et catalla,* as a man unacquainted with the law " might very naturally do." So far Justice *Wilmot;* and if any one will examine the devises to which he refers, he will find the argument holds more strongly in the devise here; because in the devises there, there were distinct devisees, and distinct subjects of devise in distinct sentences; here he will find the devise to the wife and children to be of the same subject, and in the same sentence.

Justice *Wilmot* farther observes in that case, which is also an argument in ours, *that there is no devise over*.

In the case of *French* v. *M‘Ilhenny* it is to be noticed that the devise for life was but of *one half of the plantation;* and as to the remaining half, it had not a life estate to support it, and to make it a remainder of the fee simple. As to the half therefore, it must be considered as given nakedly, without any part hewn out; and to have been held to be a fee, by the mere force of the words *bequeath the plantation.* It is true that in that case we had the word *estate* in the introductory part of the will, which was noticed by me, not that I laid any stress upon it in my own mind, but as referring to the English decisions which have laid stress upon it in some cases. For the truth is, I have always thought the argument drawn from the word *estate, effects, settle* &c. &c. whether introductory, or in the devise itself, to be but a quibble; and to have been adverted to in these decisions as a way of getting over a rule of construction which had better been set aside. It is on the same principle that slight matters have been laid hold of, collateral to the devise itself, to take the case out of the general rule, such as the devisee paying *even a small sum*, say forty shillings.

The heir is said to be favoured by the common law; but *quære*, whether he is so under our laws, where the right of primogeniture has been abolished *or abridged from the earliest period*, and the proprietary grants, and the statutes of distribution, and decisions of the courts, and the policy of the whole law, look to alienation and subdivision of property. But the devise in this case *to a stranger*, savouring of the *testamentum inofficiosum*, I should be disposed to favour the heir; for I would look to the estate as coming from the ancestors, and the right of the testator to devise, as subject in a degree to this consideration, in which the law of descent may find some reason for its policy. In this case the devise is to *a sister's children*. It is *by an uncle to orphans*. It is of a plantation of *his own acquisition*, and which *did not descend to him;* it being the same tract of land, *as he himself recites*, which he bought of *Jacob Jones*. No claim therefore could be grounded on the acquisition of an ancestor, and the interest of a common stock. He was free therefore to dispose of it,

1811.

CLAYTON
v.
CLAYTON.

absolved from all common law consideration. How is the heir to be favoured, who had been passed over with a reasonable provision for him and his children in the same will? I am the more particular in the consideration of this case, from a respect to the Judge of the Common Pleas from whom the appeal comes. And having been led to expect a majority of this court against me, I am solicitous that it may appear that I have strong impressions, if not strong reasons to justify my dissent.

Judgment affirmed.