#### OF

## PENNSYLVANIA.

### Southern District. September Term, 1810.

1810.

*Chambersburg,*
*Tuesday,*
October 2.

### Lessee of BLAINE *against* JOHNSON.

THIS was an appeal from the judgment of the Chief Justice at a Circuit Court for *Cumberland* in *June* 1807.

It was an ejectment for a messuage and 240 acres of land, to which the plaintiff claimed title, under an application of the 8th *October* 1766, No. 1499, in the name of *James Byers*, for " 250 acres in *West Pennsbury* township, *Cumberland* " county, joining lines with *John Byers up* the south east, " and *M'Callister's* land on the east." A survey was made on this application upon the land in dispute, on the 8th of *November* 1787, (according to thē return of survey,) by *Samuel Lyon* deputy surveyor, who stated in a note to the return, that the land was disputed by the heirs " of *William Carothers*, who " claimed under warrant to him of 100 acres dated *December* " 28, 1770, and an application for 300 acres No. 4993, dated " 25th *May* 1768, and had agreed to refer the dispute to the " board of property." On the 15th *May* 1768 *Byers* conveyed to the lessor of the plaintiff.

The defendant was tenant to the heirs of *William Carothers* tract, so as to acquire a legal settlement right.

*Qu.* Whether the Supreme Court can upon an appeal from the Circuit Court, hear any evidence which was not before the Circuit Court, even though such evidence has been discovered since the trial in the Circuit Court, and its discovery is the ground of an application to the Supreme Court for a new trial.

A descriptive location, the survey on which is unreasonably delayed, loses its preference against a subsequent warrant or location with a prior survey, —against a settlement right acquired before the survey on the old location, —and against a notorious well established possession under a subsequent descriptive location.

*Qu.* Whether a person residing on one tract, can make a legal settlement *by a tenant* on another

who claimed in part under an application of the 21st *May* 1768 in the name of *William Carothers* junior for 300 acres " adjoining *William Carothers, Andrew M'Callister, Daniel* " *M'Callister, John M'Clure, and Abel M'Callister* junior, in " *West Pennsbury* township *Cumberland* county;"—partly also under a warrant of the 28th *December* 1770 in the name of *William Carothers* junior for 100 acres, " joining land of " *John Machure, William* and *James Carothers*, in *West* " *Pennsbury* township, *Cumberland* county;"—and partly upon a settlement by *Carothers* about the year 1776, or at least upon a notorious possession of the property by him at and after that time, under his descriptive location.

The deputy surveyor, who was examined for the defendant upon the trial, could not say how long it was since he had made the survey in the name of *Joseph Byers;* there were at that time some buildings on the lower part, some land was cleared, and he thought some persons were living there; but whether under *Carothers* or not, did not appear. The survey in the name of *Byers* he said answered the location; and although it might have been laid in a different direction to answer the location, yet it would not have answered it so well; it would not have joined *M'Callister* on the east. In 1785, when the witness made a survey of some adjoining land for *John Reynolds*, the land in dispute was claimed by both *Carothers* and *M'Callister.*

Other witnesses swore that in 1776 or 1777 there was a cleared field upon the land in dispute, 20 or 25 rods long, and 30 or 35 feet wide, which was in possession of *William Carothers* who resided on his neighbouring farm.

*Duncan* for the defendant contended, that admitting the plaintiff's location to describe the land surveyed, still it gave no title, as it had not been pursued for more than twenty years, and in the mean time the defendant obtained a descriptive location of the same land, and either made a settlement, or took notorious possession of the land under it, prior to the survey. That from these circumstances the law was clearly in his favour.

*Watts* for the plaintiff, acknowledged that a location *and survey* for the defendant, subsequent to the plaintiff's loca-

tion, and prior to his survey, would give a preference; and that a settlement and *residence* according to law, prior to the plaintiff's survey, that is, such a settlement as is mentioned in the act of 1786, an actual, personal, resident settlement, would under the circumstances of the plaintiff's survey, be preferred to it; but he denied, that a man resident on one tract, could acquire a right to another tract by a settlement made for his use by a tenant, or by such a possession as was said to have been in *Carothers*. It was observable, that the deputy surveyor in his note to the plaintiff's return, did not place the claim of *Carothers* upon settlement or possession, but on the application and warrant; and if there was a tenant upon the land in 1787, it did not appear that he held under *Carothers*, and therefore the defendant could not derive title through him.

The Chief Justice, after stating the evidence to the jury, told them, that the plaintiff's location of 1766 not being surveyed until 1787, a prior survey under a subsequent location or warrant, would be intitled to a preference. So would a settlement right legally acquired before the plaintiff's survey, that is, a settlement accompanied with residence as described in the act of assembly. So also would a notorious and well established possession under a location subsequent to the plaintiff's, descriptive of the land in dispute; but to establish this right of possession, it should be clear and certain. He did not think that clearing a few acres adjoining to another plantation, would, without a survey, give a right to a large undefined tract of land; but the notoriety and extent of possession was a fact which he left to the jury. With regard to the point, whether *Carothers*, living on one tract of land, could make a legal settlement so as to acquire a settlement right, by a *tenant* on another tract, the Chief Justice wished the jury for the present to suppose that he *might*, reserving that point however for future consideration, in case the jury should find for the defendant. This point he thought doubtful, and wished it to be settled by the Supreme Court in bank.

The jury found for the plaintiff; and a motion for a new trial being overruled, the defendant appealed.

Upon the hearing in this court, the defendant offered to

1810.

Lessee of
BLAINE
*v.*
JOHNSON.

shew by evidence, that since the trial, he had caused the trees of the plaintiff's survey to be blocked, and that their growths did not in any instance correspond with the alleged time of that survey. But the court refused to hear the evidence. His counsel then relied upon the field notes of *Lyon* the deputy surveyor, who was the brother-in-law of the plaintiff, to shew by a memorandum therein that the lands in dispute were "surveyed for *Carothers'* heirs and *Blaine*, "in dispute," and not as the official return set forth, upon the order for *Byers*; and they produced two papers, one the original order of survey, the indorsement on which, "executed *November* 8th 1787," had been written on an erasure, the figures 1798 being distinctly visible under the other figures, the other a protracted draft of several surveys laid down together on the 18th *November* 1791, for *Wm. Carothers*, found in the office of the deputy surveyor, who succeeded *Lyon*, and which, though it noted in the margin several interferences with the lands of *Carothers*, did not mention the plaintiff's interference. A similar draught was shewn on the trial, but without date. Upon this evidence, discovered since the trial as was said, as well as upon the merits as they appeared in the Circuit Court, the motion for a new trial was argued.

YEATES J. I fully assent to the charge of the Chief Justice, and think the case went to the jury upon the true points of inquiry. The plaintiff's application in the name of *James Byers* was dated on the 8th *October* 1766, but not being specially descriptive of the lands in question, no title became vested in him, until the same was surveyed. The warrant and application in the name of *William Carothers* junior, under which the defendant claims, are of later dates. It was fairly submitted to the jury to determine, whether the same were surveyed prior to the plaintiff's, or whether a settlement right was legally acquired; or a notorious well established possession under a location descriptive of the lands, though subsequent to the plaintiff's, existed previous to the plaintiff's survey. They were instructed, that as these facts were found either in the affirmative or negative, so ought to be their verdict. But clearing lands beyond the limits of a man's lands without an intention of settlement, will not confer a settle-

ment right. It is clear therefore, that the time of execution of the plaintiff's order of survey, became highly material.

The official return of survey by *Samuel Lyon*, the brother-in-law of the lessor of the plaintiff, purports, that the survey was made on the 8th *November* 1787. This is evidence of that fact, but not conclusive. It may be repelled by other proof. Mr. *Lyon* on his examination swore, that he could not tell when he made the survey on the application of *Byers;* nor who were the chain carriers; that there were some buildings on the lower part of the land, and some land cleared then near the road, on the north side of it; and that some persons were living there; and that he made a large draught of lands surveyed for *William Carothers*, which was shewn to him in court, *without date*, which he declared to be a private survey without warrant, or any public authority.

The defendant's counsel have insisted, that material evidence has been discovered since the last trial, which would shew that the plaintiff's survey was not executed on the 8th *November* 1787. The court will, under special circumstances, award a new trial upon such grounds, where a proper case is made; but where the non-production of it on the trial arises from the neglect or *laches* of the party moving, they will refuse the motion. It is always heard with caution and hesitation. It may be often brought forward upon a mere pretext, and naturally leads to perjury after the strength of the adverse party is known.

It has been urged, that the trees marked on the lines of the plaintiff's survey have been blocked, and their growths in no instance correspond with the alleged time of survey. The court upon the argument refused to receive this evidence; because it being clear, that disproving the alleged time of survey in the return was of great moment in the cause, the defendant ought to have been prepared to shew such blocks on the trial; he shall not avail himself of such negligence on his part.

The same remark applies to the field notes of *Lyon*, whereby it appears, that the lands in question " *were sur-* " *veyed for* Wm. Carothers' *heirs and* E. Blaine, *in dispute;*" though the official return specifies, that the survey was made on the order of *Byers.*

The field notes were in the possession of *Lyon*, and used on the motion for the new trial before the Chief Justice. The, immediate matter of inquiry naturally led to a demand of the field notes, which if overseen at the trial cannot now be urged as the ground of a new trial.

But the two papers now produced strike me in a different point of view. The first is an indorsement on the original order of survey directed to *Samuel Lyon*, " executed *November* " 8th 1787." The figures are written on erasures. Instead thereof the figures 1798 appear to have been originally written, and are still distinctly visible.

The second is a protracted draught of several surveys laid down together on the 18th *November* 1791, for *Wm. Carothers*, found in the office of Mr. *Ramsay* the deputy surveyor of the district, who succeeded Mr. *Lyon*, which contains a marginal memorandum of its interference with other surveys specially noted. A similar draught was shewn on the trial without date. It has been contended, that if the survey was really made for *Byers* in 1787 it would have been noted in the margin of the large draught made in 1791 with the other interferences.

The question then is, can neglect or *laches* be reasonably imputed to the defendant in not producing these two papers on the trial? Would it occur to any one to examine the original order of survey to determine whether the time of survey as returned, was antedated? Could it be supposed, that the execution of the order would create suspicion of the order itself? Would a person be led to examine the office of a district surveyor, to search for draughts of private surveys, said to have been made without authority?

I am compelled to answer in the negative in both instances, and therefore I cannot ascribe negligence herein to the defendant. There can be no danger of perjury in suffering papers in the handwriting of Mr. *Lyon* the witness, who is now deceased, to go to another jury. It is not for me to point out the effect such testimony would have on the minds of intelligent and conscientious jurors. I abstain from making remarks, which might prejudice the merits of the cause on another hearing. I content myself with observing, that the

two papers relied on are of some weight, and in order to arrive at a full knowledge of the case, ought to be taken into consideration by another jury. It appears to me, that there are reasonable grounds to suppose that justice has not been done, that the case has not been heard on a disclosure of all the facts, and that it demands reconsideration.

It may possibly be said, though it was not urged by the plaintiff's counsel in the argument, that the reasons I have given were not contended for by the defendant's counsel in the court below. I promptly answer, they could not insist on grounds which they knew not at the time, and that *laches* could not reasonably be imputed to them in this particular. I have explicitly stated, that should this negligence be justly ascribed to *Carothers*, he could not succeed on the present motion; but that the matter strikes me differently as this case stands. The Circuit Court is an emanation from this court, and under the act of 20th *March* 1799, 4 *St. Laws* 562, the Circuit Courts were established in all the counties in the state except *Philadelphia*, and came in as a substitute for the courts of *Nisi Prius*. In *Kennedy* v. *Lowrey*, 1 Binn. 398, it is expressly stated by the Chief Justice, as the opinion of the whole court, that the judge, who tried the cause reports the evidence as if the trial had been at *Nisi Prius*, and that the object of the change was to make the administration of justice as convenient as possible, by bringing not only the trial, but all the proceedings (the judgment included) to every man's home. In that case, which was tried before me at *Meadeville*, entire damages were given in slander, wherein the declaration contained five counts, one of which was said to be bad, the words laid therein not being actionable. The court directed judgment for the plaintiff to be entered on the good counts, though the same had not been asked for in the Circuit Court. If the present evidence had been urged and verified to the Chief Justice, upon the motion for the new trial, I think, though I speak diffidently, he would have had little hesitation in granting the motion. I consider that every thing is open upon appeals to this court from the Circuit Court, and that this court will do what the Circuit Court would have done, on the same matter appearing to the judge presiding there. Why, when new merits are disclosed, which

the party complaining has obtained knowledge of by mere accident, (if I may so express myself) shall we change the possession, and turn him round to a new ejectment? Why should we thus needlessly augment the field of litigation?

There is no dearth of authorities on this point. I can recapitulate four. In *Dunning's Lessee* v. *Carothers*, tried at *Carlisle* before Judge *Smith*, and a verdict for plaintiff, a new trial was awarded, on the deposition of *James Smith* esq. taken after the trial. In *Mitchel's Lessee* v. *Ritchell*, tried here before Judge *Smith* and myself, the plaintiff failed in deducing the title down to himself; upon an appeal, the court granted a new trial upon the deposition of *Robert M'Culloch*, produced to this court, curing that defect. In *Waln* v. *Wilkins et al.*, tried before all the judges of this court in the city, the deposition of *Alexander Scott*, who had not attended the trial, had great weight in inducing the court to grant a new trial, and justice was finally done to the satisfaction I believe of every honest mind. And in *Ross's Lessee* v. *Cutshall*, tried at *Bedford* before Judge *Brackenridge* 10th *October* 1806, and reported in 1 *Binney* 399, a verdict passed for plaintiff. On the appeal the deposition of *Thomas Stewart* was read, and had great influence in determining the minds of the court, that the land surveyed under the *Maryland* warrant did not answer the description in the warrant. 1 *Binney* 403.

Upon the whole, I am of opinion that the judgment of the Circuit Court be reversed, and a new trial awarded, upon the defendant's paying the costs of the former trial.


BRACKENRIDGE J. An appeal from the verdict of a jury and the judgment of a court before whom the cause was tried, to a court, who, from the fullest and most correct report that can be made of the evidence, can have but as it were the frontal bones of the evidence, without flesh, complexion, and expression, approaches near to an absurdity. And hence it is that the system of Circuit Courts which has been so happily abolished, has proved so vexatious to the suiters, irksome to the judges, and unpleasant to the counsel in the cause. Had the appeal been confined to matter of law, so that the verdict of the jury, and the judgment of the court upon it had been conclusive as to matter of fact, it would have been more tole-

rable. But even while it did exist, and yet exists in the shreds of it, that is, in the review of cases tried under it, I am disposed to restrain the consideration of the conclusions of the jury sanctioned by the court, on matter of fact, to something extremely obvious indeed. It would seem to me that an instance but rarely occurs if ever in the courts of *England*, where a verdict has been set aside on the ground of being against evidence, where in the opinion of the judge before whom the cause was tried at Nisi Prius, the verdict was according to the evidence.

In the case before us I am not clear from the report of the judge before whom the cause was tried, that there were grounds that would justify the granting a new trial; and had I been in the place of the judge, I do not know that I should have granted it. But on a verdict sanctioned by his judgment, I certainly should not.

But the application now is to hear evidence that was not before the judge; evidence which has been discovered since the trial, and which, had it been before him, would have induced him to grant a new trial. It is made on the ground of *surprise* on the part of the defendant, that the surveyor who was examined, did *not charge himself with a fraud* in returning a survey made as of a date prior to that at which it was made. It is to be noted also that the surveyor was called by the defendant to establish a fact, of which he must have had the suspicion that it did exist. I mean to say that it appears in the course of the examination that one of the facts which was expected to be brought out by the surveyor, was that of the actual date of the plaintiff's survey. It shews that he was aware of the possibility of an antedate in the return; and ought to have had at least the blocking of the trees made; and it cannot be said that he had not enough to put him upon inquiry as to the original location or order in the hand of the surveyor, or rough draught, or any other paper, even should it require the office to be swept to find it. I use this expression, because in fact the offices of deputy surveyors have been kept in a very loose way, and papers straggling from their proper place might be easily overlooked. But in contemplation of law they must be supposed to be kept with care, and every paper

1810.

Lessee of
BLAINE
*v.*
JOHNSON.

in its place; and that with due search the papers now disco-vered might have been found; especially by a party who would seem to have had a suspicion of the very fact of which they are thought to induce a presumption. The inconveni-ence of indulging such a latitude for new trial, and the appli-cations it would bring upon us on the ground of after disco-vered testimony, that would explain or supply that given at the trial, strikes me as an insuperable difficulty in the way of looking at what is offered on the present occasion, so as to make it a ground of granting a new trial.

But this is not the only difficulty in the way. Are we in the place of the judge before whom the motion below was, to the same extent with himself, as to the hearing this evi-dence? Our judgment on the appeal, ought it not to go upon the same evidence which he had before him? At the first breaking of the case I had inclined to think we might take the latitude of examination we are called upon to exercise. But upon reflection, I am inclined to doubt the power of going so far.

The Circuit Court law provides, " that if any of the par-ties shall be dissatisfied with the judgment of the Circuit Court, on any motion for *a new trial,* that then and in such case, there shall be an appeal; but that no such appeal shall be available unless the counsel for the appellant shall state in writing his reasons for said appeal, and subscribe his name to the same, certifying his opinion that the same " are suffi-" cient in law to obtain a decision in favour of his client, and " not made for the purpose of delay." The decision of the court above is to be certified and remitted to the Circuit Court, to be carried into execution.

It is an appeal from the judgment of the Circuit Court, that is to be made, and which is to be confirmed, or *reversed,* and this reversal cannot but be referred to the reasons filed, and which are of *record in the cause.* It must be taken to be at least on some of the *grounds alleged* that the reversal goes. The solemnity of subscribing names to the reasons filed, gives this part of the record a peculiar importance, and can-not be laid out of view. The *probata* and the *adjudicata* here must agree. I am not able to distinguish, and to say that we have a greater latitude on the appeal on matter of law or fact, than we have on a writ of error on matter of law. If we

put ourselves, in the place of the court below, it can only be as to the evidence before them. We must be confined to the reasons filed as strictly as on plea pleaded we confine the evidence before a jury. I doubt our power to go out of the reasons; and having this doubt, I am unwilling to exercise the authority. The suiter might have reasonable ground to complain of injustice, in the delay given. The defendant losing possession, can bring an ejectment in his turn, and recover for mesne profits, if on another trial he shall be found to have the best title.

I do not see that we can, for the cause now shewn, and which can make no part of *the record*, though it might of *a report*, reverse a judgment given under an act of the legislature, which gives a special power on the appeal, and it would seem to me cannot be extended to embrace this case under the idea of a liberal construction. I am not clear that we could admit a statement of the evidence now offered, to be put upon the record collateral to the reasons filed, or in addition to them; and if we did, and the judgment was reversed, it would appear that it was not upon the reasons filed under the act, but upon reasons as in the court below *upon common law authority*. I am aware that depositions are said to have been heard to contradict or supply evidence which had been before a jury, and that upon this, judgments of the Circuit Court have been reversed. But of this I believe the correctness has never received examination; and if in any case it has taken place, it would seem to have been fallen into from what has been done under the Nisi Prius courts, and may be still done under the Nisi Prius court in *Philadelphia*, in which case no judgment given will have a reference to reasons filed as a ground of the motion for a new trial. What has passed *sub silentio* in practice, is very distinguishable from what has received the solemnity of a consideration on argument, and the sanction of decision. I incline therefore to refuse to hear the testimony offered, and to affirm the judgment.

The court being thus divided in opinion,

Judgment affirmed.