[S. C., 2 Tenn. 211; Cooke, 220.]
The plaintiffs filed their bill on the 20th of October, 1808, in which it is stated that they claim a 5000 acre tract of land by virtue of an entry in John Armstrong's office, No. 535, in the name of Jones Kendrick, made on the 27th of October, 1783, in these words: "Jones Kendrick, 5000 acres of land, on the west fork of the second creek above Gen. Green's land, that empties into Duck River on the south side, beginning near the fork of said creek, and extending up the said west fork for complement." That Elijah Robertson, on the 29th of October, 1783, made three entries in the same office, for 5000 acres each, Nos. 1043, 1044, and 1045, which are situated in the neighborhood of the plaintiffs' entry, 535. These entries were surveyed and granted previous to the year 1791, and the entry No. 1044 has been transferred to the defendant, to whom a grant issued in the year 1790. That Thomas Gill also had an entry on the same books, made on the 30th October, 1783, for 1860 acres, which also lies in the neighborhood of the plaintiff's entry. The bill asserts it ever was the intention of the owners of entry No. 535 that it should be surveyed in an oblong, twice as long as broad, beginning at the junction of the east and west forks of Fountain Creek, and running the oblong west up the west fork. That the entry has not yet been surveyed; if it be run in an oblong form as was intended it will include great part of the laud granted to the defendant, by virtue of the entry No. 1044; and in like manner, if in a square, it will include a considerable part, though not so much. But if *Page 490 
it be surveyed in the latter form only two of the four plaintiffs will be included in the defendant's grant. It is expressly charged, that the plaintiffs have applied to the principal surveyor of the district in which the land is situated to survey the entry No. 535, in an oblong, as pointed out above, but the surveyor refused to do so. The plaintiffs insist, that, agreeably to the thirty-eighth section of the Land Law of 1807, and the laws of North Carolina, referred to by that section, they are entitled to have their entry surveyed in the above-described oblong form; that, in consequence of the refusal of the surveyor to survey it in that manner, the plaintiffs have been prevented from getting a grant, and thus rendered incapable of instituting or defending actions of ejectment; and that the plaintiff, Kendrick, had sold parts of said oblong to different individuals, who are in possession. Richard Dallum, the defendant, taking advantage of these circumstances of the plaintiffs, hath instituted several actions of ejectment against them; and whether the entry No. 535 be surveyed in a square or oblong, it greatly interferes with Dallum's grant, as well as Gill's and Elijah Robertson's entry No. 1043. A plat is exhibited, showing the connection of these and other granted lands in the neighborhood; of ten 5000 acre tracts laid down in this plat, it is remarkable that not one was surveyed in a square, nor were three others of less quantity. Copies of nearly all these entries have been read, and none of them call to be surveyed in a square, or any other particular shape. The bill prays process against Dallum, that he may be enjoined from proceeding to turn the plaintiffs out of possession until the question shall be decided whether they shall have their entry, 535, surveyed in an oblong, with the usual general prayer.
An injunction was granted.
Dallum, in his answer, insists that his entry is special, and if he had surveyed strictly conformable to it, would have interfered more with the plaintiffs' claim than he now does; that he has fairly and without fraud obtained a legal title; that the plaintiffs' entry is vague, uncertain, and not sufficient to wrest from him his legal title. It is insisted by the *Page 491 
defendant that, should the plaintiffs' entry be deemed valid, they have no right to have it surveyed in an oblong form, as an intention to do so was not expressed in the entry; there is no claim in the neighborhood older than the plaintiffs', which would have prevented them from running the entry out in a square; and if it were so run, it would interfere with other claims in a less degree than in an oblong; insists that as the plaintiffs have not obtained a grant, they have no right to come into equity, and exhibits his title papers as part of his answer.
To this answer there is a replication. From the evidence and admissions of the parties, it appeared that Gen. Green's land was a place of notoriety at the time the plaintiffs' entry was made; that Fountain Creek is the second creek that falls into Duck River on the south side above that tract of land. The description of Fountain Creek, with its branches, is thus given by several witnesses: In going up it from its mouth, at 121 poles, is the mouth of Silver Creek; it is about nine miles in length; at its mouth it is about one-third of the width of the main creek, and in summer not more than one-sixth part of the water; proceeding still up the creek, Hurricane Creek and Brush Creek empty into in it, but their size is much smaller than Silver Creek; the next is the two forks nearly of a size, one now called Globe Creek, the other or western fork, called Fountain Creek. From the mouth to these two forks is five miles, 125 poles. Each of these main forks have many branches, but in going up they diverge from each other; they are nearly of a length, size, and water, and about seven miles to their head springs. The plaintiffs claim their beginning at the junction of these two forks, and have proved that the surveyor refused to survey in an oblong.
In the discussion of the case at the bar, three grounds have been taken by the defendant's counsel.
1st. The entry is vague.
2d. The plaintiffs are not entitled to a survey in an oblong if the entry were good. *Page 492 
3d. Supposing both these points with the plaintiffs, they have no ground of equity to enable them to come into this court.
It is contended that the word "fork" may as well apply to Silver, Hurricane, or Brush Creeks, as the one where the plaintiffs claim their beginning, any branch of a creek is a fork; there being many branches or forks to this creek, the entry is therefore uncertain. It was further urged that several entries made the same day with the plaintiffs and a few days afterwards call this creek Fountain Creek, and the plaintiffs were bound to call for the creek by its usual name; these entries were shown to the Court; and that creeks of small comparative size have obtained the name of forks as Smith's fork of the Caney fork, and the north fork of Duck River.
Much has been said respecting the certainty an entry should contain, the expression frequently occurs in the books, most frequently in relation to pleading, but it is equally applicable, and may as often arise, in any of the transactions of life where ideas are to be communicated, — so much certainty as is necessary to answer the purpose in view is required. Language or writing may be sufficiently certain to one purpose and not another. Thus Lord Coke, in Co. Lit. 303 a, speaking of certainties, says that "certainty to a commonintent is sufficient in pleas in bar, to a certain intent ingeneral is required in pleadings on the part of the plaintiff; and lastly to a certain intent in every particular is required in estoppels."
De Grey, C. J., in delivering the opinion of the twelve judges in the House of Lords in the case of Res v. Horne, Cowp. 682, 688, says the expression in its application has no precise abstract meaning.
In 1 Com. Dig. Kyd. ed. 57, 317, we find the expression "convenient certainty," and in the same page the kind of convenience spoken of is explained to be so much as will describe the thing to a common understanding, not such as would exclude all imaginary intendments. Cowp. 862.[1]
What would be the meaning of this entry in common understanding, or with those acquainted or who *Page 493 
might become acquainted with this creek? It is the second creek above Green's land; Lytle's Creek being the first. The exemplification given of the expression "fork" by the defendant's counsel is natural. In speaking of a fork of a tree, road or creek, we understand something of equality in the size of the branches.
A small branch may acquire the name of fork; when this is the case, the mind fastens on the name which is always arbitrary, and not on the description of a fork according to common language. Names thus acquired, usually have some adjective, which completes their designation. Besides, the expression "the fork," denotes, in common acceptation, the greatest; and those inferior in kind are expressed by some addition.
The junction of Globe and Fountain Creeks is manifestly the place designed for the beginning of the plaintiff's entry.
In common understanding, it would be so considered by those acquainted with the creek.
It has been insisted that certainty is the same here as in Kentucky; nay, that it is the same everywhere.
Many cases have been cited from Hardin's Reports respecting certainty in entries. It has been already shown that certainty is not the same thing at all times, and on all occasions. The certainty of entries in Kentucky depends on the laws of that country; so of certainty here, it depends on our own laws, and they are in some respects essentially different; and thence arises a difference in the degree of certainty required by the two codes, as will be shown hereafter.
Though the creek had acquired the name of Fountain Creek at the time the entry was made, it cannot invalidate this entry, which does not profess to give notice of the place entered by name, but by description. Thus much may be predicated of entries in every country, as well in Kentucky as here, to wit, the mode of construing the meaning, and what shall be considered as notorious, is the same; and not that the same degree of notoriety or *Page 494 
precision as to boundary or mode of surveying entries shall be required everywhere.
On this occasion, which it is hoped will be the last, a comparative view will be taken of the laws of Kentucky and this State, respecting entries, and as this view will necessarily comprehend the mode of surveying, both will be considered together.
The Act of 1783, c. 2, is the basis on which most of our land claims rest, particularly in the western part of the State. In order to a full comprehension of this act, a cursory view will be taken of those preceding. The fifth, sixth, and tenth sections of the Act of November, 1777, c. 1, point out the mode of entering, surveying, and settling disputes by caveat. It is worthy of remark, that there was no court of equity at that time; a caveat was supposed an adequate mean of affording redress. The surveyor was directed, on receiving warrants of survey from the entry taker, to survey the respective entries as soon as may be. It was not contemplated that the owner or proprietor would have any agency in making the survey. It thence resulted that every entry should be sufficiently notorious, to give the surveyor information of the place intended to be surveyed. Beside, equity and reason would dictate that entries should possess so much certainty as to enable subsequent locators to know, by reasonable industry, the situation of such entries. The fifth section directs that every location shall be in writing, setting forth the most remarkable places in and about the land entered, or the lines of other lands if contiguous. Each entry to have its proper date and number in order of time. Here the provision respecting entries stops. But when this section is taken in connection with the tenth and other sections, with the sixth section of the Act of April, 1779, c. 6, respecting the mode of surveying, it is manifest the legislature did not design or require as much precision in an entry previous to the Act of 1783, as seems to be contemplated by the laws of Kentucky. There, the statute requires an entry should be made with such precision that subsequent enterers may know the vacant residuum. This provision was the more requisite there, because surveys were not confined to any particular form; they *Page 495 
might be run to any point of the compass, and in any shape. Our law requires the surveyor to run all lands in a square or oblong, not exceeding in length twice its breadth, and to the cardinal points, unless bounded by the lines of older claims, when they may be in any shape binding on such lines. The laws of this country do not say what degree of precision an entry shall possess. In practice, and agreeably to the decisions of our courts, if an older entry possess a notorious call, as to include a spring, and a surveyor runs it out in a square or oblong, including the place called for in any part, such survey holds against any subsequent interfering entry.[1]
It has, however, been strongly urged that this construction of the law leaves subsequent entries in the neighborhood at the mercy of an older entry, as it is uncertain how such entry may be run out; in fact that all claims within a circle the centre of which shall be the beginning of an entry and its radius the largest line of an oblong whose lines are in a duplicate ratio, will be endangered. Such hardship and difficulty, it is contended, never could have been within the view of the legislature. This reasoning is the more specious, because it is founded on principles of abstract equity; but when tested by legislative regulations, and the existing state of the country when the land laws were made, it is perceived to be unsound, and in practice inapplicable. The precision in entries contemplated by the laws of Kentucky was found almost universally unattainable in practice. See Taylor v. Bodley, Sup. C. U. S. 1812.
The most prominent feature in the land law of North Carolina is a sedulous and unremitted care that the oldest enterer should obtain the oldest survey and oldest grant. It is true the Act of November, 1777, has no express provision on this head; the legislature then seemed to think there would not be any disputes except among settlers, § 6, which was to be determined by caveat. In April, 1779, c. 6, § 6, they first discover a sense of the inconveniences arising from the interferences of surveys. In October, 1779, c. 4, § 9, the idea again occurs.
When the Land Laws were revived and amended *Page 496 
in 1783, c. 2, and when regulations were made for entering and surveying throughout the State, the legislature, in § 19, complain that "whereas many disputes have and may arise from the surveyor giving preference to warrants of a younger date, and not certifying in the return of survey, the date of the entry and number of the warrant under which the same is surveyed, by means whereof grants have in many instances issued on such returns contrary to the true intent and meaning of the said act," meaning the Act of November, 1777, c. 1. The remedy provided is, that entry takers shall semi-annually on or before the 1st of April and October deliver to the surveyors the warrants of survey; they are directed to survey entries in their order of date, to return a list of surveys to the secretary in the same order, and by this list the secretary is to make out grants. See further provisions in the law to secure to the oldest enterer the first survey and first grant, 1786, c. 20; 1787, c. 23; 1796, c. 7; 1796, c. 9, and Tenn. Laws, 1801, c. 1, § 7.
In other respects concerning entering and surveying, the Act of 1783 is an exact copy of the Act of 1777. The earliest enterers of land in Kentucky, as well as here, were not very precise in their descriptions. To include a certain spot; beginning at some notorious place; lying on some watercourse; or adjoining the lines of some other claim, and similar general descriptions were common. There, as well as here, such was the wild and dangerous state of the country, much greater precision was not practicable. In this state of things the courts of Kentucky, with the maxim ut res magis valeat quam pereat on one hand, and the impracticable precision required by their statute on the other, felt themselves constrained to adopt a course by presumption or equity, as to the manner in which these entries of general description should be surveyed, otherwise they would be lost. For the want of the precise description in entries required by their statute, they were not disposed to say that such entries should be void in toto. As to the mode of their being surveyed, a meaning was given by presumption, so as to make them conform as nearly as they could, to the spirit of their act, — for *Page 497 
instance, an entry calling to include a certain spot, or beginning at some known place, was directed to be surveyed in a square to the cardinal points, and the spot to be included should be in the centre. So if it called to be on a creek it was made to lie equally on both sides,c., and, by these principles, disputes as to patented lands were decided. The precision which was designed by statute to be in the entry was supplied by presumption or equitable construction of the courts, keeping in view their statutory regulations. The enterers, no doubt, did not foresee that such a construction would be given, and by the Supreme Court of the United States, in the case of Taylor and Quarles v. Brown, February, 1812, it is called artificial. As surveys in that State could be made to any point of the compass, and in any lineal form; and as entries were required to be made with so much certainty that subsequent enterers might know precisely the adjacent vacant residuum, such a construction seemed necessary there to effectuate as near as possible the intention of their act; the decisions of the courts of that State were not founded on general principles of equity alone, but with a view to the spirit and meaning of their legislative acts.[1],[2] *Page 498 
Let us now examine the features of our own statutes by which this court must be governed,[3] and see whether they suggest such construction of entries as have been adopted in that country. Our statutes are silent as to the degree of certainty an entry should contain. It is left to be collected from the whole of the Land Laws; the first enterer is to have the first survey and first grant. Express provision is made that if a second enterer should lose his land by a prior claim he shall either have his money refunded, or take land in another place; the surveyor is to run out lands without the direction or control of the claimant, and the surveyor shall ran in a square or oblong, unless, c., to the cardinal points; none of these regulations exist in Kentucky. The primary intention of an entry with us was to give the surveyor and subsequent enterers notice where the land was intended to be entered, so that the officer might know where to find the land to survey, and subsequent enterers know how to steer clear of the neighborhood of it. and to caveat: it was not expected or intended that it should be so precise as to give notice of its boundaries as was contemplated in Kentucky, and which was there found unattainable in practice. Where directions are given by the government to the surveyor, in what manner he is to run out lands; where that surveyor is to do this duty as a public officer, without any reference to the directions of the claimant, and consequently acts independently of him; where he is commanded to survey all entries in a square or oblong in the manner already adverted to; where the law is silent as to the degree of precision in entries: in a country where these officers are commanded to give the preference of survey to the oldest enterer, and the secretary to issue the first grant to him; where, in thus running out the land of the elder enterer, if a younger one shall thereby lose in whole or in part the law provides his purchase-money shall be refunded, or he may remove to other vacant lands; and when the legislature of North Carolina brought her western lands into market, she was sensible it was a wild and dangerous country, and difficult, to be explored. With these regulations, and under all these circumstances, we cannot suppose *Page 499 
they designed a precision in entries, which, in the language of Lord Coke, would be equivalent to certainty in every particular. The certainty as to boundary, contended for by the defendants, amounts to this: a species of certainty wisely rejected by the twelve judges of England, in the case of Rex v. Horne. If permitted, I would define the certainty in an entry contemplated by our Land Laws to be such as would be necessary in common understanding for the convenient attainment of the views of the legislature, in the appropriation of lands; taking into view at the same time the situation of the country in which entries were to be made. An entry should carry on the face of it reasonable notice to the common understandings of men acquainted in the neighborhood of it, of some call therein, so that other enterers might know when they were without its sphere.[2] If otherwise, it would be undefined, so vague that it might as well be surveyed at one place as another, until it be rendered certain by grant or registration. Equity would always relieve subsequent enterers against such a claim, as well as against an entry surveyed obviously contrary to its meaning. Suppose the case of a caveat, which was the original remedial process contemplated by the legislature in their Act of 1777; was it ever heard that a younger enterer could confine an older one to a square in such case? It is believed not. He would be told that the law authorized it to be run in an oblong, complying with its calls; that the preference of survey was expressly given to the oldest enterer by law, and he could not be deprived of it by a younger entry being made in the neighborhood. And in such case it would seem to be sufficient, if the call or calls of the older entry were complied with according to common understanding; if to include a spot without specifying in what part of the survey, it were good if included in any part, and so of other cases. Such is general usage from the commencement of the land law. Consuetudo est optimainterpres legum et communis error facit jus.[1] It is *Page 500 
important to the interests of society that the laws governing real property should be fixed, permanent, and well known. A court of equity would not require greater certainty, if as much, after the emanation of a grant, as would be required on a caveat. It would give to the elder entry the preference secured to it by law in the survey and grant; and consider things in the same point of view as if the surveyor had done his duty in surveying it first,[2] and afford the same benefit as if the secretary had issued the oldest grant in the proper order of date.[3]
The principles laid down in Hardin, 194, respecting the statutory preference to pre-emptioners, would lead to this conclusion.[4] The legislature of North Carolina, when bringing their western lands into market, opened the office at Hillsborough for the discharge of their debt incurred during the war, at a time of great scarcity of specie, and as one of the conditions of purchase, in order to encourage speedy sales, expressly declared that first enterers should have a preference in surveying and obtaining grants.[5] This preference of the first enterer, over those of subsequent date, may the more easily be accounted for when we consider the anxiety of the State to discharge a debt of gratitude; the scarcity of specie, an extensive, remote, and then not much esteemed, tract of wilderness country, and their greatest care to procure purchasers. For the purpose of *Page 501 
doing this, the provisions of this act, as well as the Act of 1777, seem calculated to secure this preference from the embarrassments of subsequent claimants as far as was practicable. It was conceived there was more good land than could be sold. If this preference be not founded on the most exact ideas of equality, it is admirably calculated to prevent litigation, as experience has most amply shown. There was certainly no injustice in it, as every enterer would know the terms of his contract with the State when making an entry, to wit, that prior enterers bad a preference in obtaining surveys and grants. Enterers of lands were generally citizens of the Atlantic part of the State, and far removed from the wilderness in which the lands were to be appropriated: a minute description in location could not be expected. If the legislature had so designed, they certainly would have expressed themselves with that view; it cannot be considered as a casual omission; they were employed, when passing the Act of 1783, in amending their Act of 1777, from which many titles had originated. This act, as to entries, uses the same language employed in the Act of 1777. Had they discovered from experience that greater precision in entering and surveying were requisite, they surely would have amended this part of the law; and their not doing so is evidence of their satisfaction with the practical exposition of the Act of 1777. In further confirmation of this idea, as to the specialty of entries and mode of surveying, the conduct of our own State is not inapposite. In their Act of 1806, c. 1, § 10, the precision in entries contemplated by the laws of Kentucky is expressly required, but the legislature, on further experience, found it inconvenient, and by Act 1807, c. 2, §§ 38, 40, adopted the language of the Acts of 1777 and 1783, in relation to entering and surveying lands.[2] *Page 502 
From the most perfect view I am capable of taking of the acts respecting the appropriation of vacant lands, aided by all the light the general course of judicial decisions can afford, with usage under those laws, I am constrained to be of opinion that the plaintiffs' entry is sufficiently special; that the proper mode of surveying it is to begin at the fork of Globe and Fountain Creeks,[3] and to run south and west so as to include the 5000 acres called for in the entry, either in a square or an oblong, not exceeding in length twice its breadth, up the west fork, now called Fountain Creek; and that the surveyor may so run in every such case, where he is not restrained by lines of older claims (which do not exist in this case), or by natural boundaries.[1] In the course of this reasoning it may be easily discovered that the Court cannot with propriety make any order on the surveyor to run out the entry in an oblong. The claimant has no right to control him, the entry must be his guide, and as that does not state that it shall he surveyed in that manner, it would be improper for us to give any directions. Had the surveyor insisted on running contrary to the calls of the entry, it *Page 503 
would have presented a different question. To enable the surveyor to comply with the requisitions of the North Carolina laws, it is indispensably necessary that he should act independently of the claimant. A survey on this entry, either in a square or oblong, will be good in point of law.
The third and last view to be taken of this case involves an inquiry into the jurisdiction of this court. It is said, that if the Court should be of opinion that the surveyor did not transgress the bounds of his duty, in refusing to survey in an oblong, this court cannot entertain jurisdiction. There was no legal impediment to the plaintiffs going on to get their survey and grant, and as there was none, they ought not to be permitted to come into this court until they had done all they could at law.
It does not at present appear that the proprietor of an entry cannot in any case come into equity before he gets a grant; it is not necessary to decide that point in this case. It had been usual with the surveyors, for thirty years, to conform to the wishes and directions of claimants in surveying their lands; the plaintiffs might well suppose it was a matter of right that their claim should be run out as they wished, in an oblong, and, on the refusal of the surveyor to do so, it was as natural for them to think of recourse to some court for redress. To say the least of it, the point as to directing the survey was involved in doubt;[2] but as they were likely to be turned out of possession, whether the survey was in a square or an oblong, this court has jurisdiction in restraining the defendants from doing so, where there appears to be a clear and, well ascertained right.[3]
Jurisdiction, as to any part, draws with it incidental means for the effectuation of justice. 1 Hen. Mun. 19; Massie v. Watts, S.C. U. S. 1812, MSS.
Let the injunction he continued, and the plaintiffs go on to perfecttheir right.
[1] Lawe on Pleading, 52; 2 H. B. 530.
[1] This principle was recognized by Todd and M'Nairy, judges of the Circuit Court of the United States, in several cases at Nashville, June term, 1812. Ut audivi.
[1] Hardin, 472.
[2] In 2 Swift's Syst. p. 426, the author, when writing on equity proceedings, and the decisions of those courts, observes, "Regard must be had to the collective system of equity; that prior decisions, if any, must be attended to, and that the fundamental principles of law, grounded on political calculations of general good, must not be contravened." In the case of Massie v. Watts, Sup. C. U. S. 1812, the Court seem to proceed on the principles laid down in the text. After noticing the difficulties of making entries with certainty, owing to the situation of the country, the Chief Justice remarks, "that the great and equitable principle on which they stand is this, — if by any reasonable construction of an entry, it can be supported, the courts will support it. This principle absolutely requires that all discretion; with respect to the mode of surveying an entry, should be surrendered. For if a location might be surveyed in various ways, then it is vague, and no subsequent locator would know how to enter the adjacent residuum. The Court, therefore, is compelled to say in what manner every location which appears in its terms to reserve some power in the locator to vary its form shall be surveyed. These remarks arose out of the statutes of Kentucky respecting the appropriation of vacant lands. See MSS. in the hands of Judge Todd.
[3] 3 Binn. 391.
[1] 3 Binn. 30, 32; Maryl. 139.
[2] 3 Binn. 35.
[1] 2 Term Rep. 24; 2 Am. L, Journal, 104;. Maryl. 67, 86, 212, 131; 2 B. C. C. 148; Newl. Cont. 397, 408; 4 Dall. app. viii., xxiv.; 1 Cra. 50, 109; Barnet's Lessee v. Russell et als,; Nashville, November, 1808; 1 Call, 428; 1 Burr. 419, 423; 2 Mass, 477; Vin. Ab. tit. Precedent; 1 Hay. 318; Hoggat v. M'Crory, ante, p. 8; 1 P. Wm. 452, 399; 1 Binn. 249, 390.
ORIGINAL NOTE. — Since the passage of the Act of 1783, the time allowed for surveying has been prolonged from time to time by statutes; and as it was the duty of the surveyor to survey the plaintiff's entry before younger ones in its neighborhood, negligence or laches cannot be imputed to him, the time for surveying being still open by law. See the case of Taylor and Quarles v. Brown, S. C. U. S. February, 1812; MSS. 3 Binn. 120; Hardin, 193.
[3] 1 Fonb. B. 1, c. 6, § 9; Francis's Maxims, 13th Maxim; 2 Dall. 428; 4 Dall. 210, 218; 2 Day, 166; Taylor and Quarles v. Brown, Sup. Ct. U. S. 1812, MSS., Campbell's Lessee v. Erwin, Fed. Court, West Ten.
[4] Vide Taylor v. Bodley, S. C. U. S. MSS.
[5] See caption, §§ 1, 14, 18-20 of Act of 1783, c. 2.
[1] Co. Lit. 365 a; 1 Caines' C. E. 65; Binn. 477; 3 Binn. 13; Weakly's Lessee v. Simmons and Wilson, ante, p. 3V0; 3 Binn. 491; 6 Co. 6.
[2] The mode of obtaining titles to lands in Pennsylvania, on warrants, seems to be more analogous to our own laws than those of Kentucky or Virginia. In Pennsylvania, on payment of the consideration to the State, or for other cause, a warrant issues which contains the location. These locations are in general terms, as adjoining the claim of some other person, or to include some place. See Add. 52, 216, 296, 248, 249, 251, 252, 292, 293, 305; 1 Binn. 166; 2 Binn. 14; 3 Binn. 103. In the case of Hamilton v. M'Cullock, Add. 272-274, an entry calling to include the White Oak Level, adjoining the heirs of McKee, deceased, was deemed a special location. In pp. 390-393 is an instance of a vague one. The first warrant or location gives the best right, but in 4 Dall. 218, it is said a vague undescriptive warrant is not sufficient to affect a subsequent claim. In none of the reports of cases which have come to hand has it been perceived that any dispute arose respecting the manner in which surveys were made. Hence, it seems fair to presume that if surreys conformed to locations, according to common understanding, they were deemed sufficient to give the best right to all the land included within them, their laws being complied with in other respects. There are many other analogous points in the land laws of these two States.
[3] In the case of Allison's Lessee v. Roper, Mero District, May, 1803, it was decided by CAMPBELL and WHITE, JJ., on a motion for a new trial, that a call lying on a creek above Martin Fifer's claim should be construed to adjoin Fifer above, and in Taylor v. Bodley, S. C. U. S. 1812, a call to begin about seven miles from a particular place, was construed to mean precisely seven miles from that place.
[1] Weakly's Lessee v. Wilson and Simmons by the whole court; viz, Humphreys, Powel, and Overton, Clarksville, Dec., 1808.
[2] 3 Johns. 590, 605; 2 Caines' Cases in Error, 51; 1 Ves. Jr. 424.
[3] Pre. C. 530; 1 Ves. 476; 2 Ves. 453; 2 Bro. 65; 1 Bro. 557; 3 Johns. 604.