The bill states, that Mark Robertson, in the month of October, 1783, agreed to sell two locations or descriptions of land of 5,000 acres each, situated on Duck River, and Fountain Creek, in the Middle District of the State of North Carolina, and to superintend the surveying thereof. The said James Holland agreed to convey to said Mark Robertson one equal fourth part of the lands to be secured as soon as titles should be obtained. And as evidence of and security for performance of said agreement said James Holland gave his bond on the eighth of October, 1783, in the penalty of one thousand pounds with the condition following: "That whereas the said Mark Robertson hath furnished the said James Holland and William Gilbert with two locations containing ten thousand acres, upon Duck River and Fountain Creek, and also is faithfully to superintend the surveying of the said land, and provided the said Holland and Gilbert should obtain indefeasible titles to the same by virtue of said entries and lands when surveyed, then and in that case the said Holland and Gilbert should transfer and convey to the said Robertson, his heirs and assigns for ever, 2,500 acres of the said land, of equal value, in proportion to the quantity, then the above obligation to be void, otherwise to remain in full force and virtue." Before the execution of the bond, the entries had been made in the office of John Armstrong kept at Hillsborough, in the following words: "No. 421, twenty-fifth October, 1783, James Holland 5,000 acres in Greene county on the western waters, lying on Duck River, beginning on the south side of the river, about a mile below the mouth of Fountain Creek, and extending up both sides of the *Page 275 
river including the mouth of Fountain Creek, for complement. No. 542, twenty-seventh October. 1783, William Gilbert, 5,000 acres, on the western waters, on both sides of Fountain Creek, on the south side of Duck River, about three miles above the mouth of the creek, and extending up both sides of the river for complement." These entries were actually surveyed under the superintendence of Mark Robertson; and grants vesting valid and indefeasible titles therein issued the tenth of July, 1788. That Holland holds still of the lands granted to himself about 1,200 acres; that the remainder he hath sold at different times, and he claims the land granted to Gilbert, but by what title is not known.
The bill then states Elijah Robertson's interest in a large number of land contracts, and among others in Holland's contract, and recovered the lands. That Mark Robertson died, and left his wife Mary, and James Robertson executor and executrix, who proved the will, and in 1798 Elijah Robertson died, leaving the complainants his heirs-at-law. That on the 25th of September last, said Mary having before intermarried with John M'Nairy, and said John, by indorsement on said bond on the back thereof, with their names thereto subscribed, assigned the said bond to John Childress in trust for the complainants. That the plaintiff, Childress, hath applied to the defendant to convey according to the said bond, but he hath failed, and prays a specific performance, c. The answer states that on the declarations of the said Mark, that said two locations were for lands of the first quality, and equal in value to any in the western country, be was induced to enter into the contract, and signed the bond of the import of that in the bill stated, and for many years after fully intended to execute the condition; and it would now give him pleasure to do so, if he could, in justice to himself. He admits Childress applied to him for a specific execution soon after the extinguishment of the Indian title, but from his solicitude he suspected *Page 276 
the claim was not good. And this defendant employed General Isaac Roberts to survey the same, when he discovered the deception, and that the land, instead of being of the first quality, was of the most inferior quality; that of the first quality there were not three hundred acres; and of the whole, not one-half fit for cultivation. That he suggested to said Mark that to avoid bad land it would be better to have smaller locations that he replied nothing would be gained by that, and, trusting to these and similar declarations he had entered into the bond. That he now knows these statements are false, and that he was deceived; but from the lapse of time and death of witnesses, it is difficult to support this averment; and brings before the Court the bond and the faithful surveying, c. that this has not been done, but is far contrary to the locations. That the Gilbert tract, according to his opinion and the law, ought to have been oblonged up the creek. That by oblonging it across the creek it afforded Elijah Robertson, who superintended the surveying, an opportunity of laying a warrant not located there for himself, and thereby takes 5,000 acres. He believes there are no interfering claims; but that, if Mark Robertson had faithfully superintended the surveying, the lands would have been of one third more value. He charges that he hath been deceived and injured by the surveying so as to enable Elijah Robertson to take so much good land, which ought to have been included in his survey. The defendant admits he offered to convey 2,500 acres, being the part wrongfully taken in surveying, which was refused; that he told said Childress if he intended to pursue his claim to bring suit; but why protracted till now he knows not; that said offer was not made from a legal or equitable obligation but because the bond was not worth attending a suit at law for. He further answers, that soon after the entries were made he sold three-fourths of the Holland tract reserving one-fourth on the north-east *Page 277 
corner for the compliance with his contract; but when he discovered He imposition the settled it himself, and hath improved it. That with regard to the other tract, Gilbert was to have conveyed to him, but died without having done so; and thereafter the took legal means to realize it and recovered judgments, to satisfy which the land was sold to him as the highest bidder for $3,050, and hath the sheriff's deed which he believes to be valid, and that he hath been put to great expense in securing it.
Several grounds of defence are taken upon argument in this case, some of which are predicated upon the answer, and others raised upon the testimony. The first ground is that the defendant was misled by the misrepresentation of Mark Robertson, and his statements before the purchase of the locations in saying the land was of the first quality, and equal to any in the western country; that by these declarations and averments of the said Mark, he was induced to enter into the contract; that the fact being that these locations are not of lands of the first quality, he was deceived, and therefore not bound to specific execution. To prove this defence and that Mark Robertson made these representations, the deposition of Colonel Benjamin Herndon is relied on, which states that, in a conversation deponent had with General James Robertson, relating to the entering lands on Duck River, the general recommended his brother Mark as knowing the lands better than himself, and introduced the said Mark to this deponent; and while in conversation relative to those lands. Major James Holland came into the room, and much was said about the quality of the lands of which the said Mark had locations, and the said Mark stated to the deponent that the locations he was then selling and did sell to him, covered lands of the first quality; that they joined lands he, the said Mark, had located for Major Holland, which he said was rate land. This is the principal passage relied upon; and taken in conjunction with another *Page 278 
which I shall afterwards notice, constitutes the proof on this part of the case. I can not see, I confess, this testimony in the Light it is viewed by the defendant, as giving information to him and containing a description of the lands and a representation of their quality before his contract or agreement for the purchase of them; but quite the reverse. This is a conversation between Mark Robertson and Herndon, which took place at a particular time, to-wit, when Mark Robertson was selling a location to the deponent, and it refers to an antecedent time when the defendant's purchase is mentioned; to a time that is passed then, to an act that is done and finished before the then present time of this conversation. The words are, had located for Major Holland, or, in other words, had sold to Major Holland. It is too late, information that is received after an act is done, to influence the agent in doing that act. This seems to me to be the plain and obvious meaning of the deposition. An inference was attempted in argument to be drawn from the number of the entries of Holland and Herndon. from their dates and relative position on the books in the office, to prove that this conversation must relate to the purchase of Holland, as well as of Herndon, and show that both purchases were at the same time. But I do not think that any thing material is to be derived from these circumstances. The persons intending to make entries in Armstrong's office were there some time before it opened, for the purpose of being prepared for the opening and to be ready to seize the first opportunity of making their respective entries. It followed that those who were not provided with locations before they got there would, according to circumstances, supply themselves, but at the latest, before the opening. The contracts therefore for the locations, to a certain extent, at least, must have been all made before the first entry was made; and no argument, as it seems to me, can be drawn from their position on the entry-book as to *Page 279 
the time of the purchase of the location by the enterer. It was therefore a matter of course for Mark Robertson who was there for the purpose of selling locations, to do so, as he could find a purchaser; and no inference can be drawn from the nature of the business but this one, that the sales were made at some time or other before the opening of the office and before the entries were made. The other part of the deposition on which reliance is placed is the following question by the defend ant. and the answer thereto: Do you not think the statement made to me by the said Mark Robertson, respecting the quality of said lands, was sufficient to cause me to believe they were first rate lands? Now these statements in this question and answer evidently refer to the conversation between the deponent and Mark Robertson above alluded to upon the deponent's own purchase, stated in the first part of the deposition, and to no other statement; and alternot in any manner the import of the said conversation, which has already been observed upon. The answer to the question, it is true, contains the opinion of the deponent, but has no bearing on the ground of defence it is introduced to support. It is to be remarked, however, that the answer to the question corrects and negatives one part of the question, that part which implies the statement is made to Holland. For the answer says, statements made by said Mark respecting, c., omitting the designating; words "to you," which would have been responsive to the question, and implies the statements were made to the deponent, and refers to the former conversation, which in its turn explains this mode of expression, and justifies the correctness of the exposition now given to it. From this view of Herndon's deposition, that the description of the land therein mentioned was made to Herndon and not to Holland, upon a sale of a location to Herndon, and evidently subsequent to the sale to Holland of his locations by Mark Robertson, *Page 280 
it can not be said that he was induced thereby to enter into the contract respecting them relying upon their quality. And another circumstance exists in this case which has weight with me, and tends to prove that my understanding of the above deposition of Herndon is a correct one. It is this: that if these representations had been made, and such as are charged, and before the purchase, how are we to account for the manner of the defendant afterwards proceeding in the contract, by entering into the bond without noticing them therein? Can it be supposed that so important an ingredient in the substance of a contract was not known to him? We are not to suppose any such thing; we must take it for granted that it did not exist, or it would have been made a part of the evidence of the contract, or, in other words, be inserted in the bond; and it is to be mentioned that it is nowhere in the answer expressly charged that these representations were made before the contract or purchase of the locations, but only before he entered into the bond. If it had been his agreement to have first rate land, would he have entered into the bond without this stipulation? What could have induced him to do so? He wag not circumvented by any artifice, he was not surprised by any accident, he was not under any pressure of situation, but the reverse; he had got the locations and his entries attached to them on the books in the office; Mark Robertson might be said to be in his power; added to all this he wrote the bond himself, and was well acquainted with the legal import of the instrument; the proof, therefore, not supporting this ground of defence, it must fail.
The second ground of defence is, that Mark Robertson, attending at Hillsborough for the purpose of selling locations, is to be considered in the same light as if he had got the warrants to locate as a locator, and is liable for a faithful discharge of his duty. That these numbers being early ones, to wit, 421, 442, *Page 281 
ought to have been laid on better land. It is in proof, that at that date, o wit, in 1783, it was generally believed that all the land on Duck River was land of the first quality; that being covered in many places with cane, and then untrodden by domestic animals, it had a much better appearance than afterwards, when it had been inhabited for some time: It was further proved that, from the danger justly to be apprehended from the Indians, the knowledge of these lands was not particular and precise as at an after period when danger was removed, and when they could be explored at leisure and in safety. It was further proved that, going a distance of twenty miles west, down the river, almost every tract would be better; that going a like distance east, up the river, every tract would be worse. That taking the land upon Duck River from head to foot, it was an average tract. That Fountain Creek was a large creek; that it traversed both tracts with Silver Creek its branch, passing through the north-east corner of the Gilbert tract, and entering the Holland tract near the south-east corner, and running into Fountain Greek near the centre of that tract. That on these creeks were several mill-seats, and also one on Duck River on the Holland tract. Taking all these circumstances into view. I can not say that the locator has not done his duty in this instance. A perfect knowledge of the country at that day was not to be expected, and with less than this it might have been supposed that Holland's tracts stood as good a chance as any for good land.
A third ground of defence is, that Mark Robertson did not superintend the surveying of these tracts faithfully. The survey of the Holland tract began 275 poles below the mouth of Fountain Creek, on the river, and ran south 30, west, 130 poles, thence south 880 poles, thence east 820 poles, thence north 1010 poles crossing Duck River, then 760 to the beginning. If the second line was extended north from the second corner, it would pass the beginning sixty poles *Page 282 
distant at a point due west therefrom, which would be near the river, so that the survey covers within a few acres the same land as if it had begun one mile below the mouth of Fountain Creek. The Gilbert tract begins in the south west corner of the Holland tract, and runs west 74 poles, but measures 94 poles, then south 696 poles, then east 1220 poles, crossing Fountain Creek at a little upwards of two miles from the south-west corner, then north to Holland's line 696 poles, then west to the beginning, crossing Fountain Creek at nearly three miles from the north-east corner. All the testimony goes to show that the Holland tract could not be laid to greater advantage than it has been done. With regard to the Gilbert tract, there are different opinions, some that if it had been oblonged up the creek to Kendrick's line, it would have been better; others, that the difference, if any, would have been little, paying due respect to the calls of the entry. It seems to me that the weight of evidence supports the latter position, and that I am not authorized to say that the surveying of this tract hath not been faithfully superintended. And further, this conclusion 1 should feel myself bound to draw from the testimony, if the party were permitted by law to direct the outline of the survey in any ratio he pleased between a square and an oblong, having proper regard to the calls of the entry; But according to the ease of Kendricks and Dallum* in this court, if the party by his entry does not express the figure of his survey, and the entry instructed the surveyor, he has no right afterwards to interfere and say, Such is the figure I wish the plat to form. If, therefore, the plat in this case had been rather, disadvantageously placed, yet being legal, pursuing the calls of the entry and in conformity thereto, the defendant could not avail himself of this circumstance, and be permitted to allege against a legal execution of a survey an unfaithful execution of it. Add to this, he made the entries himself before he entered into the bond, and *Page 283 
in contemplation of law was bound to know how they would be, surveyed.
The next point made by the answer is, that the plaintiff's claim at this distance of time came too late to be sustained by the Court. That admitting he once had a right to come into this court for a specific execution, the failing for so great a length of time to exert this right, precludes him from the remedy prayed for, and leaves him to his redress at law if any he has. The facts are, that at the time these entries were made, Mark Robertson was a citizen of this place, and so continued till his death, and also the complainants were at the death of said Mark, and still are citizens of this place. The defendant was, at the date of these entries, a citizen of the State of North Carolina, and so continued until he removed to this State about the year 1807, 1808, or 1809. That in the year 1792 he was here a short time upon business, when application was made to him for a specific performance of the present contract, which was not complied with. That after his removal into this State he was applied to in like manner, and even pressed upon the subject, but he evaded it; one of their applications was made by Judge M'Nairy; the defendant resisted by alleging he could not be compelled beyond the penalty of his bond. The present suit was brought soon after the defendant was vested with the legal title to the Gilbert tract. For the defendant, on this point, were cited and relied on, 2 Powel, 260; Newland. 224; 4 Dall. 347; Vern. 633. The principle in Powel is, that where one party has trifled, or shown a backwardness in performing his part of the agreement, or has lain dormant for many years, equity considers this a good objection to a specific performance in favor of such an one: especially if circumstances are altered in the mean time. Newland nearly the same says, that where the plaintiff has consumed considerable time in unnecessary delay, the Court will not consider him entitled to a specific performance, especially where a material *Page 284 
alteration has taken place in the value of the property which is the subject of the contract. My opinion is, that these authorities do not apply to the present case. It does not appear that the plaintiff has shown a backwardness, and permitted his claim to lie dormant further than what by the circumstances of this case, may be fairly accounted for. The grants issued in 1788, in 1792 the defendant came into this State for the first time afterwards. He was then applied to for a specific execution. Upon his removal into this State he was applied to for the same purpose and even urged upon the occasion, and finally suit was brought within a short time after he had procured a legal title to the Gilbert tract, and became enabled to perform his contract specifically. But why is it said in the books that time raises an objection to a specific performance? Because, say they, in one class of cases, it is evidence of a waiver or an abandonment of the contract. But what kind of cases will raise this presumption, and furnish a justification for the Court to take this ground? Surely not this kind, where the plaintiff has paid the full consideration, has performed all on his side, and fully entitled himself to the benefit of an execution from the other. It would be an extraordinary presumption this, indeed, and such as no case introduced warrants. The authorities when looked into show this: that upon a contract for the purchase of an estate generally some deposit is made by the vendee, which he forfeits if he flies from the contract, or if the vendor flies the vendee takes his deposit back again; but if either party insist upon a specific execution then time is taken into view as an evidence of a waiver by the party applying or the plaintiff. It is but a presumption of waiver, however, and may be rebutted by accounting for it, by assigning sufficient reasons to justify or excuse the delay; as a correspondence respecting the title, clearing the title, and taking the necessary steps for this purpose; and in such cases, *Page 285 
if the plaintiff hath not practiced unnecessary delay in making out his title, the Court will not refuse him a specific performance because he afterwards suffers a period of time to elapse before he files his bill, which, in case it had passed before he had taken steps to perfect his title, would have been an obstacle to such relief. Newland, 242, 247. But this appears to be the doctrine only in those cases where the claim for specific execution rests upon the circumstances of contract only without payment of the consideration. That time is considered as evidence of abandonment. Its application belongs not to such a case as the one under consideration; as little application has that class of cases cited where time joined to other circumstances, without reference to the question of abandonment, is of material consideration. This happens where, after the time for the performance of the contract, circumstances happen materially affecting the value of the property or the benefit of the contract. As in sales of reversions or remainders, as the case from 2 Vernon is; for, by the dropping of a life, the value may be particularly affected; and besides, these contracts are induced by the pressure of the want of ready money. And were the plaintiff permitted, after lying by, speculating upon events, and heightening the necessities of his vendor by delay to claim a specific execution, it would' operate the greatest injustice. Newland, 244, 249. But these principles have no reference to the present case. The present and past value of these lands has no relation to the circumstances of the parties. The plaintiff was not lying by form accruing of his right to the introduction of his suit, speculating upon events; he was not in the interim profiting by the use of the purchase-money and calculating whether it would be most advantageous to enforce the contract or to abandon it. He had paid the purchase-money or its equivalent, performed the services for the most part at the very commencement of the business. His equitable right was coeval with *Page 286 
the defendant's legal right, and the substance of the contract was the land; and better or worse, advantageous or otherwise, with regard to the penalty of the bond, he was compelled to take it; and the defendant had a right to enforce it, even, after judgment at law, if the plaintiff had so proceeded by a decree of this court, which must have viewed the same as the essence of the contract, and the penalty as the security only of the party for a performance. I can not therefore see, upon the authorities cited, and the principles contained in them that the complainants are precluded upon this ground of defence, from the assistance of this court as prayed by their bill.
The next ground of defence is not founded on the answer, but raised by the counsel upon the face of the grant to the Gilbert tract. The fourth line of that tract, proceeding from the south-east corner, calls to run with north 696 poles to Holland's line. This course and distance forms a line at right angles with the southern boundary line, and of equal length with the western boundary line. But by distinguishing the course and running from the south-east corner to Holland's line it would form an acute angle with the southern boundary line, and would strike Holland's line at a point 320 poles west from the termination of the line run north, making a difference in the quantity of 679 acres. The plat annexed to the grant exhibits the said north line, and from its termination a line due west to the beginning, which line reaches Holland's tract at 320 poles, and thence west to the beginning, is the common line of both tracts. Upon these facts it is contended by the defendant's counsel that the grant does not cover the land contained in the survey, and that therefore that part of the condition of the bond is not complied with which stipulates that Holland and Gilbert should obtain indefeasible titles to the land. To this it was answered by the plaintiffs counsel that the case in the Supreme Court of the United States upon a question respecting lands in Sequatchie valley *Page 287 
governed this case. It was said it was there decided that the plat appended to the grant controlled the call of the grant. The existence of this case does not seem to be questioned, but its authority as binding in this court. It is true its authority is not conclusive, but I must see my way very clearly in the opposition to decide contrary to such a very respectable opinion. Independent of this ground, can it be said really that substituted titles have not been made to Holland and Gilbert on these entries?. There is at most an informality, but I can not see how this could be taken advantage of by any person to the prejudice of the defendant, without the greatest and most wilful negligence. The Act of 1801, c. 101, makes the defendant's deed, if according to the calls of the grant evidence, notwithstanding of the sale and transfer to him of the land intended to be granted, and authorizes him at any period to have the correction of the grant made. I should hesitate much if this cause turned upon this point before I could' be led to say that under these circumstances the title is not substantially indefeasible. The meaning of the clause is the condition by the parties, as it seems to me, was to secure against conflicting older claims, and thus the defendant has viewed it, for he makes no point of defence of this by his answer. The objection amounts to this: the word "opposite" is left out by mistake; for, supply this word and it is formally correct, and would then read thus: north 696 poles opposite the Holland line. Decree for the plaintiff.
* 1 Tenn., 489; Cooke, 220.